No. 24-01030

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

BOSTON MARKET CORPORATION, et al.,

Plaintiffs-Appellants

v.

MOUNTAIRE FARMS, INCORPORATED, et al.,

Defendants-Appellees

On Appeal from the United States District Court

for the Northern District of Illinois

Case No. 1:16-cv-08637

The Honorable Thomas M. Durkin

**APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX**

Lori P. Lustrin
Robert W. Turken
Scott N. Wagner
**BILZIN SUMBERG BAENA
PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone:  305-374-7580
Facsimile:  305-374-7593
llustrin@bilzin.com
rturken@bilzin.com
swagner@bilzin.com

*Counsel for Appellants*

# Disclosure Statement

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-1030

Short Caption: Boston Market Corporation, et al v. Mountainaire Farms, Incorporated, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Boston Market Corporation, Bojangles' Restaurants, Inc. and Bojangles' Opco, LLC, Golden Corral Corp., El Pollo Loco, Inc., Zaxby's Franchising LLC, Domino's Pizza LLC and Domino's Pizza Distribution LLC, Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc., Barbeque Integrated Inc. d/b/a Smokey Bones Bar & Fire Grill, Shamrock Foods Company, United Foods Service, Inc., FIC Restaurants, Inc. d/b/a Friendly's, The Johnny Rockets Group, Inc., WZ Franchise Corp., Captain D's LLC and White Castle Purchasing Co.

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bilzin Sumberg Baena Price & Axelrod LLP and Marks & Klein LLP

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

Boston Market Corporation: Boston Market Intermediate Holding Corp.
Bojangles' Restaurants, Inc: Bojangles' Inc.
El Pollo Loco, Inc.: El Pollo Loco Holdings, Inc.
Golden Corral Corporation: Investors Management Corp.
CBOCS Distribution, Inc.: Cracker Barrel Old Country Store, Inc.
Barbeque Integrated, Inc.: Barbeque Holding, LLC
FIC Restaurants, Inc.: FIC Holdings, LLC
The Johnny Rockets Group: FAT Brands Inc.
White Castle Purchasing Co.: White Castle System, Inc.

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

Cracker Barrel Old Country Store, Inc.: BlackRock, Inc.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Lori P. Lustrin    Date: 1/29/2024

Attorney's Printed Name: Lori P. Lustrin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [X]    **No** [ ]

Address: 1450 Brickell Ave., Suite 2300, Miami, FL 33131

Phone Number: (305) 350-2385    Fax Number: (305)351-2208

E-Mail Address: llustrin@bilzin.com

rev. 12/19 AK

# Table of Contents

**Page**

Disclosure Statement ............................................................................... i

Table of Authorities ............................................................................... iv

Jurisdictional Statement ..........................................................................1

Statement of the Issues ...........................................................................3

Statement of the Case ..............................................................................6

    A.    The Class Action and the Restaurants' Opt Out Claims .............6

    B.    The DOJ Criminal Trials..................................................................9

    C.    The District Court's Two-Track Structure and Required
          Track Elections ..................................................................................11

    D.    Class Certification, Opt Out, and the Simmons Settlement.......16

    E.    The Class Supply Reduction Trial Against Sanderson...............19

    F.    The Restaurants' Motion to Confirm.............................................21

    G.    The Restaurants' Motion for Clarification and Objection
          to the Settlement ..............................................................................22

Summary of the Argument.....................................................................26

Standard of Review .................................................................................34

Argument ..................................................................................................34

    I.    The District Court's Order Resurrecting a Class Bid-
        Rigging Claim is Contrary to Law .................................................34

    II.    The District Court's Determination that the Settlement is
        Fair, Reasonable, and Adequate is Fundamental Error and
        Must be Reversed ..............................................................................42

        A.    The District Court's Conclusion that the Class
            Received "Value" for the Restaurants' Bid-Rigging
            Claim is Unsupportable and Violates Established

Law on Conflict of Interest and Adequacy of
Representation ........................................................................43

B.  The District Court Improperly Shifted the Burden to
the Restaurants to Demonstrate the Unfairness of
the Settlement .........................................................................51

III. The District Court's Ruling that the Class Could Settle an
Uncertified Bid-Rigging Claim Was Clear Error .........................57

A.  The Order Violates the Supreme Court's Holdings
in *Amchem* and *Comcast* ...........................................................57

B.  The District Court's Finding that the Class Notice
Was Sufficient Was Error ......................................................66

IV. The District Court's Factual Predicate Determination
Misapplies the Law and Contradicts its Prior Orders and
Evidentiary Rulings at the Supply Reduction Trial ...................71

Conclusion...........................................................................................79

Statement Concerning Oral Argument..............................................81

Certificate of Compliance with FRAP 32(g) and CR 32 .................82

Certificate of Service ..........................................................................82

Certificate of Compliance with CR 30(d).........................................83

Attached Required Short Appendix..................................................84

# Table of Authorities

**Page(s)**

## Cases

*Alioto v. Town of Lisbon,*
    651 F.3d 715 (7th Cir. 2011)................................................................39

*Amchem Prods. Inc. v. Windsor,*
    521 U.S. 591 (1997)..............................................................*passim*

*Arandell Corp. v. Xcel Energy, Inc.,*
    Nos. 07-cv-076-wmc, 09-cv-240-wmc, 2022 WL 2314717
    (W.D. Wis. Dec. 27, 2022) .................................................................76

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    No. 94 C 897, 1996 WL 167347 (N.D. Ill. Apr. 4, 1996) ..............................64

*Burgess v. Citigroup Inc.,*
    624 F. App'x 6 (2d Cir. 2015) ...........................................................76

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)..............................................................*passim*

*Dodson v. Pan Pac. Retail Props., Inc.,*
    No. S–02–258 WBS/KJM, 2003 WL 25656778 (E.D. Cal. June
    12, 2003) .............................................................................40

*Donnelly v. Am. Express Bank FSB,*
    No. 18-cv-1024-GPC-WVG, 2018 WL 4759206 (S.D. Cal. Oct.
    2, 2018) .............................................................................40

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2013)..............................................................54

*Eddlemon v. Bradley Univ.,*
    65 F.4th 335 (7th Cir. 2023)..............................................................63

*Elna Sefcovic LLC v. TEP Rocky Mountain LLC,*
807 F. App'x 752 (10th Cir. 2020) ...................................................75

*In re Gen. Motors Corp. Engine Interchange Litig.,*
594 F.2d 1106 (7th Cir. 1979) ...............................................51, 54

*Jamie S. v. Milwaukee Pub. Sch.,*
668 F.3d 481 (7th Cir. 2012) ..................................................34

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.,*
453 F.3d 179 (3d Cir. 2006) ....................................................64

*Kleen Prods. LLC v. Int'l Paper Co.,*
831 F.3d 919 (7th Cir. 2016) ..................................................58

*In re Literary Works in Elec. Databases Copyright Litig.,*
654 F.3d 242 (2d Cir. 2011) ...............................................49, 75

*In re: Lumber Liquidators Chinese-Manufactured Flooring Prods.*
*Mktg. Sales Practices and Prods. Liab. Litig.,*
91 F.4th 174 (4th Cir. 2024)...........................................40, 41, 75, 77

*Maclin v. SBC Ameritech,*
520 F.3d 781 (7th Cir. 2008) ..................................................39

*Mirfasihi v. Fleet Mortg. Corp.,*
450 F.3d 745 (7th Cir. 2006)......................................30, 34, 42, 46

*Morris v. City of Rockford,*
No. 3:20-cv-50384, 2021 WL 5113890 (N.D. Ill. Nov. 3, 2021)...................40

*Nat'l Super Spuds, Inc., v. N.Y. Mercantile Exch.,*
660 F.2d 9 (2d Cir. 1981) ......................................................47

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999)............................................................48

*Oswald v. McGarr,*
  620 F.2d 1190 (7th Cir. 1980) .......................................................69

*Remijas v. Neiman Marcus Grp., LLC,*
  341 F. Supp. 3d 823 (N.D. Ill. 2018) ...........................................47

*Reynolds v. Beneficial Nat'l Bank,*
  288 F.3d 277 (7th Cir. 2002) ....................................30, 42, 43, 48

*Santiago v. City of Chicago,*
  19 F.4th 1010 (7th Cir. 2021) ..................................31, 59, 62, 63, 65

*Soranno v. New York Life Ins. Co.,*
  No. 96 C 7882, 2001 WL 290303 (N.D. Ill. Mar. 20, 2001) .........................50

*Synfuel Techs. v. DHL Express, Inc.,*
  463 F.3d 646 (7th Cir. 2006) ..............................................30, 34, 43

*United States v. Jayson Jeffrey Penn et al.,*
  No. 20-cr-00152-PAB (D. Colo. June 2, 2020), Dkt. 1 ........................7, 9

*United States v. Norman Fries, Inc. d/b/a Claxton Poultry Farms,*
  No. 1:21-cr-00168-RM (D. Colo.) .................................................8

*United States v. Penn et al.,*
  No. 20-cr-00152-PAB, 2022 WL 124755 (D. Colo. Jan. 13,
  2022) ...................................................................10, 11, 57

*United States v. Pilgrim's Pride Corp.,*
  No. 20-cr-0330-RM (D. Colo. Feb. 23, 2021), Dkt. 58 ......................8

*In re W. States Wholesale Nat. Gas Antitrust Litig.,*
  725 F. App'x 560 (9th Cir. 2018) ..............................................76

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ...........................................................59

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
  396 F.3d 96,106 (2d Cir. 2005) ..........................................................75

*Williams v. Gen. Elec. Cap. Auto Lease, Inc.,*
  159 F.3d 266 (7th Cir. 1998) ..........................................................75

*Woodson v. Folton,*
  614 F.2d 940 (4th Cir. 1980) ....................................................41, 77

**Statutes**

15 U.S.C. §§ 1, 15, 26..........................................................................1

28 U.S.C. §§ 1291, 1407........................................................................2

28 U.S.C. §§ 1331, 1337(a).....................................................................1

**Rules**

Federal Rule of Civil Procedure 23.............................................*passim*

Federal Rule of Civil Procedure 41..............................................39

Federal Rule of Civil Procedure 54..............................................1

## Jurisdictional Statement

Appellants allege various violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, by the major suppliers of chicken, including the Simmons Defendants, to (i) artificially restrict the supply of chicken; (ii) manipulate the Georgia Dock price index; and (iii) rig-bids and fix prices. The district court has subject-matter jurisdiction of these claims under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. §§ 15, 26.

On December 11, 2023, the district court entered its order denying Appellants' Motion for Clarification and their Objection to the direct purchaser class's settlement with the Simmons Defendants. R.7083. The next day, the district court entered its Order Granting Direct Purchaser Plaintiffs' Motion for Final Approval of the Settlement with the Simmons Defendants, and as part thereof, "pursuant to Rules 54(a) and (b) of the Federal Rules of Civil Procedure" entered a final judgment "dismiss[ing] on the merits and with prejudice all Claims in the DPP action against [Defendant] Simmons." R.7085.

Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291, which grants courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." Because the district court litigation is a multidistrict litigation pursuant to 28 U.S.C. § 1407, claims that have no bearing on this appeal involving distinct parties remain pending in the district court.

The Notice of Appeal was filed in the district court on January 5, 2024 and is thus timely filed under Federal Rule of Appellate Procedure 4(a)(1)(A).

**Statement of the Issues**

This is an appeal from (i) the district courts' December 11, 2023 order denying Appellants' (the "Restaurants")[1] Motion for Clarification and their Objection to the direct purchaser class's (the "Class") settlement with defendant Simmons ("Simmons") (the "Order") (A.0001); and (ii) the district court's December 12 order granting final approval of the Settlement (the "Final Approval Order") (A.0011). The issues on appeal are as follows:

1. Whether the district court erred in holding that the Class's formal abandonment of any bid-rigging claim nevertheless allowed the Class to pursue a bid-rigging claim so that the Class could settle and release bid-rigging as part of the Simmons Settlement.

---

[1] The Restaurants are Boston Market Corporation, Bojangles' Restaurants, Inc. and Bojangles' Opco, LLC, Golden Corral Corp., El Pollo Loco, Inc., Zaxby's Franchising LLC, Domino's Pizza LLC and Domino's Pizza Distribution LLC, Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc., Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill, Shamrock Foods Company, United Food Service, Inc., FIC Restaurants, Inc. d/b/a Friendly's, The Johnny Rockets Group, Inc., WZ Franchise Corp., Captain D's LLC, and White Castle Purchasing Co.

2.      Whether the district court erred in determining that the Simmons Settlement was fair and reasonable notwithstanding that:

   a.      the Class Representatives and Class Counsel were not adequate representatives of the Restaurants and other class members with bid-rigging claims due to their fundamental and irreconcilable conflict of interest with the Restaurants; and

   b.      the Class's admission that it settled and released the Restaurants' bid-rigging claims for no consideration.

3.      Whether the district court erred in approving the settlement of a bid-rigging claim that was not and could not have been certified under Rule 23.

   a.      Whether the district court erred in determining that the Class's certification notice was sufficient to alert class members that by remaining in the Class they would give

up their individual bid-rigging claims when the notice did

not mention bid-rigging.

4.      Whether the district court erred in concluding that the Track

Two bid-rigging claim arises from the same factual predicate as

the Track One supply reduction claim when the district court

previously ruled that bid-rigging was an entirely separate

conspiracy from the supply reduction conspiracy and that bid-

rigging evidence was inadmissible during the Track One supply

reduction trial.

**Statement of the Case**

The Restaurants are opt out plaintiffs who filed independent lawsuits alleging multiple conspiracies perpetrated by the major suppliers of chicken ("Defendants"), including Simmons, to (i) artificially restrict the supply of chicken; (ii) manipulate the Georgia Dock price index; and (iii) rig-bids and fix prices.

## A. The Class Action and the Restaurants' Opt Out Claims

The *Broiler Chicken Litigation* was commenced in September 2016 on behalf of a class of direct purchasers with the filing of the *Maplevale Farms, Inc.* complaint. A.0419, R.1. The Class alleged that from 2008-2012 the chicken suppliers engaged in a conspiracy to restrict the supply of chicken and drive up market prices. *See id.* The Class also alleged that Defendants conspired to artificially inflate the Georgia Dock—one of three major indices used for chicken pricing. *See id.*

Beginning in June 2020, the Restaurants filed opt out complaints. *See, e.g.*, A.0535, R.3654-1, Boston Market Complaint. Unlike the Class Complaint and other previously filed opt out complaints, the Restaurants'

Complaints alleged for the first time that during the 2012-2017 period certain Defendants engaged in a conspiracy to rig bids and fix prices targeted at Quick Service Restaurants ("QSRs") and other contract-based customers. *Id.* at ¶¶208-230.

Also in June 2020, the Department of Justice ("DOJ") issued an Indictment in the District of Colorado against officers of certain Defendants for engaging in a conspiracy to rig bids and fix prices in violation of Section One of the Sherman Act. *See United States v. Jayson Jeffrey Penn et al.*, No. 20-cr-00152-PAB (D. Colo. June 2, 2020), Dkt. 1. Restaurant Golden Corral is specifically identified (anonymously as QSR-3) as a targeted victim in the Indictment's allegations. *See id.* at ¶¶58-62.

That same month, Defendant Tyson announced that it was cooperating with the DOJ's bid-rigging investigation as part of its application for leniency under the DOJ's corporate leniency program.[2]

---

[2] *See* https://www.tysonfoods.com/news/news-releases/2020/6/tyson-foods-statement-department-justice-indictment-broiler-chicken

On October 6, 2020, the DOJ issued a Superseding Indictment which charged six additional executives of Defendants and expanded the time period for the bid-rigging/price fixing conspiracy from 2012 through at least 2019. *See* No. 20-cr-00152-PAB, Dkt. 101.

On October 23, 2020, the Class amended its complaint (for a fifth time) to include allegations of bid-rigging and price-fixing that paralleled the Restaurants' complaints and the DOJ Indictments. A.0828, R.3919 at 127.

Thereafter, Defendant Pilgrim's Pride pleaded guilty to the 2012-2019 criminal conspiracy to rig bids and fix prices. *See United States v. Pilgrim's Pride Corp.*, No. 20-cr-0330-RM, (D. Colo. Feb. 23, 2021), Dkt. 58. On February 23, 2021, judgment was entered adjudicating Pilgrim's guilty of price-fixing and bid-rigging as alleged. Pilgrim's was fined $107.9 million for its criminal violations of the Sherman Act. *Id.* at Dkt. 60.

On May 19, 2021, the DOJ issued an Indictment against Defendant Claxton, and on July 28, 2021, the Department of Justice issued an Indictment against Defendant Koch. *See United States v. Norman Fries, Inc. d/b/a Claxton Poultry Farms*, No. 1:21-cr-00168-RM (D. Colo.), Dkts. 1, 30. Also on July 28,

2021, the DOJ issued an Indictment of four other former Pilgrim's executives. *See United States v. Jason McGuire et al.*, No. 1:21-cr-00246-DDD (D. Colo. July 28, 2021), Dkt. 1.

## B.  The DOJ Criminal Trials

On September 2, 2021 and September 8, 2021, Chief Judge Philip A. Brimmer of the United States District Court for the District of Colorado convened a James Hearing in advance of the criminal trial against the defendants named in the June Indictment and Superseding Indictment.

In his Order following the James Hearings, Judge Brimmer found "by a preponderance of the evidence" that "[t]he government has shown that a conspiracy to rig bids and fix prices for broiler chicken products in the United States did exist and that such conspiracy operated between at least August 2011 and early 2019."  A.2428, No. 20-cr-00152-PAB, Dkt. 559 at 7.

On October 25, 2021, the DOJ commenced a jury trial against the 10 individuals named in the June Indictment and Superseding Indictment.

During the criminal trial, a former Pilgrim's employee, Robbie Bryant, testified that the purpose of the bid-rigging conspiracy was to increase prices

to Restaurants and other QSRs in advance of one-on-one contract negotiations. A.2480-81, No. 20-cr-00152-PAB, November 2, 2021 Crim. Trial. Tr., Dkt. 861 at 192-93 (Bryant testifying that plan to raise prices applied to KFC and "the rest of the QSR [quick service restaurant] business" including "Popeye's, Church's, Bojangles" and "Boston Market.");[3] *see also* A.1268, R.5455 at ¶973.

The trial concluded on December 16, 2021, with the jury unable to return a verdict. Judge Brimmer thereafter declared a mistrial. *See* No. 20-cr-00152-PAB, Dkt. 920.

On January 13, 2022, Judge Brimmer issued his order denying the criminal defendants' motion for judgment of acquittal. A.2719, *United States v. Penn et al.*, No. 20-cr-00152-PAB, 2022 WL 124755 (D. Colo. Jan. 13, 2022). Judge Brimmer stated that "[t]he Court finds that the evidence is sufficient for a reasonable jury to find that the charged conspiracy existed and that

---

[3] Unless otherwise noted, all emphasis is added and all internal citations and quotations are omitted.

each defendant knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it." *Id*. at *13.

Judge Brimmer further found that "the testimony of government witness Robbie Bryant, a former Pilgrim's employee, is sufficient to support a finding beyond a reasonable doubt that a conspiracy existed" between the corporations that employed the 10 criminal defendants "to rig bids and fix prices." *Id*. at *3; *see also* A.1268, R.5455 at ¶896.

Following the first trial, the DOJ tried the case again resulting in another mistrial. The DOJ tried the case a third time against four defendants, which resulted in acquittals.

### C. The District Court's Two-Track Structure and Required Track Elections

In September 2020, in the midst of the flurry of criminal indictments, the district court issued an order bifurcating the supply reduction and Georgia Dock claims from the bid-rigging claims and staying bid-rigging discovery. A.0688, R.3835.

As the predicate for this determination, the district court concluded that "***evidence of bid-rigging is not necessary to prove the supply reduction***

*or Georgia Dock claims*" and thus the latter could move forward without the former.  A.0694, *Id.* at 7.

On October 15, 2021, the district court issued an order ("October 2021 Order") vacating its bifurcation order as "premature."  A.1164, R.5128 at 4. However, in order to "accommodate any plaintiff that would like to continue to trial on the supply reduction and Georgia Dock conspiracies without discovery into bid rigging claims," the October 2021 Order implemented a formal two-track structure.  *Id.*

The district court established Track One for those plaintiffs who agreed to abandon a bid-rigging conspiracy claim and instead proceed solely on their market manipulation claims, which the district court said it would prioritize.  A.1156, *Id.* at 5.  The October 2021 Order further required that those plaintiffs selecting Track One "must so stipulate and concede any appellate issue on trying these claims without bid rigging discovery."  *Id.*

Those plaintiffs who chose to prosecute the bid-rigging conspiracy claim in addition to their market manipulation claims could do so, but on a separate Track Two.  The district court required the plaintiffs electing Track

Two to file a separate consolidated complaint ("Track Two Complaint") which was to include allegations of the bid-rigging conduct and serve as the "operative complaint for Track Two DAPs." A.1186, A.1187, R.5305, R.5306. The district court further ruled that all Track Two bid-rigging discovery would be stayed pending the district court's ruling on the Defendants' motions to dismiss the Track Two Consolidated Complaint. A.1186, R.5305.

Following the issuance of the October 2021 Order, several plaintiffs began filing stipulations to proceed on Track One which contained caveats, reservations and carve-outs that sought to preserve rights with respect to bid-rigging. *See, e.g.,* A.1167, R.5150 (End User Class), A.1171, R.5151 (Direct Class), A.1174, R.5185 (AWG), A.1177, R.5189 (Kroger & Publix), A.1181, R.5191 (Commercial Indirect Class), A.1183, R.5192 (Winn-Dixie).

In response, the district court held a hearing *sua sponte* on December 20, 2021 to resolve any ambiguity and confirm that the two-track structure was a binary choice. "***No bid rigging claims are going to be tried in Track One either as stand-alone claims or with bid rigging as an element or***

*component of a broader conspiracy claim premised on market manipulation claims*."  A.1201, R.5322, December 20, 2021 Hearing Tr. at 11.

The district court also made clear that no plaintiff could be in two tracks at the same time:

> Track One *will not get another bite at the apple after a Track One trial*, meaning you can't try a -- if you're in Track One, that will be your only trial. If you want to allege bid rigging as part of an overall conspiracy or as some other type of your case in chief, go to Track Two.

*Id.*

The district court emphasized that "Defendants are going to have to defend many trials, but they shouldn't have to defend multiple trials against the same plaintiffs.  So if you choose to go to Track One, that is your choice, and you can do that.  If you wish to include bid rigging as part of your conspiracy claims or as a separate charge, that's going to be in Track Two."  A.1202, *Id.* at 12.

On December 21, 2021, the Class filed another stipulation reaffirming its election to proceed on Track One under the district court's conditions

stated at the December 20, 2021 hearing and abandon any bid-rigging claim. A.1188, R.5307.

On January 7, 2022, the Restaurants elected Track Two and expressly preserved their bid-rigging claims. A.1266, R.5334.

On February 28, 2022, the Restaurants and the other Track Two plaintiffs filed the Track Two Complaint, which included an extensive 65-page section setting forth the evidence of the bid-rigging conspiracy drafted by the Restaurants. A.1268, R.5455, Compl. at ¶¶874-1109. It contains direct quotes from the bid-rigging Defendants' emails produced during the criminal trial that show the communication network the bid-rigging Defendants established to ensure that supposedly competitive bids to their QSR victims were aligned. *Id*.

With the exception of the briefing on Defendants' multiple motions to dismiss the Track Two Complaint in the fall of 2022, the Restaurants' cases (and all other Track Two cases) have been stayed.[4]

_____

[4] As of the date of this appeal, the district court has not ruled on the Track Two motions to dismiss.

### D. Class Certification, Opt Out, and the Simmons Settlement

On October 30, 2020 the Class moved for class certification ("Certification Motion"). A.0861, R.3990. The Certification Motion relied exclusively on allegations of supply reduction and Georgia Dock manipulation and did not mention bid-rigging in any respect.

In support of its Certification Motion, the Class presented the expert report of economist Dr. Colin Carter to establish a methodology for measuring class-wide damages. Like the Class's Certification Motion, Dr. Carter limited his damages analysis solely to the class allegations of supply reduction and Georgia Dock manipulation and never considered bid-rigging. A.0912, R.3990-112 October 30, 2020 Class Certification Report at ¶188 ("[t]hese estimates suggest that Defendants' supply restrictions and index manipulation increased prices for a substantial number of Direct Purchaser Class Members."); ¶196 ("I conclude that established economic methodologies and other common evidence support the allegation that Defendants conspired to raise and fix prices for broilers within the United

States through supply restrictions and fabricating control of the Georgia Dock Price index.").

On May 27, 2022 the district court granted the Class's Certification Motion. A.1763, R.5644 ("Certification Order"). The district court limited its Rule 23 analysis—including its discussion of Dr. Carter's class-wide damages model—exclusively to the Class's supply reduction claim. A.1774, *Id.* at 12 (identifying the "two primary common questions" in the Class case as: "(1) whether Defendants engaged in a conspiracy to reduce supply to increase price; and (2) whether this conspiracy caused Plaintiffs to suffer injury."); A.1788, *Id.* at 26 (finding "Carter's method identifies a significant decrease in supply and, as will be discussed below, a corresponding price increase . . . . Unsurprisingly, this analysis neatly fits the Plaintiffs' claims and theory of harm. There is no *Comcast* problem here.").

Consistent with the Certification Motion and Dr. Carter's analysis, the term "bid-rigging" does not appear anywhere in the Certification Order.

Following certification of the Class's market manipulation claims— which again was after the Class formally abandoned any bid-rigging claim—

the Class sent notice to class members (the "Notice").  A.1818, R.6195, Ex. A.

The Notice stated that a class was certified for the claims being asserted in

the Class case.  *Id*. at ¶8 ("[u]nless you exclude yourself . . . you cannot sue,

continue to sue, or be a part of any other lawsuit against the Non-Settling

Defendants and their affiliates that pertains to the claims in this case."); ¶11

("[u]nless you exclude yourself, you give up the right to sue the Non-Settling

Defendants for the claims set forth in the litigation.").

Like the Certification Motion and Certification Order, the Notice does

not mention bid-rigging in any respect.

Based on the Class's Track One election and the Restaurants' Track

Two election, the Restaurants did not participate in the certified class "opt

out" procedure.

On June 1, 2023, the Class filed its Motion for Preliminary Approval of

its Settlement with Simmons.  A.1833, R.6596.  The Settlement was for $8

million to be allocated proportionately to each class member, regardless of

their individual claims and based solely on volume of purchases.  A.1860,

R.6597-1.

## E.    The Class Supply Reduction Trial Against Sanderson

The Track One market manipulation case proceeded with expert discovery, *Daubert* and summary judgment briefing,[5] and a Track One trial. The trial commenced in September 2023 solely against Defendant Sanderson.

During motion in limine briefing in advance of the Sanderson trial, the Defendants sought to exclude any bid-rigging evidence. They asserted that bid-rigging was a separate conspiracy from supply reduction—accomplished during a different period, by different parties, by different means, and for different purposes—and thus bid-rigging evidence was inadmissible at trial. A.1936, R.6708 at 35 ("[Track 1] Plaintiffs should be barred from attempting to use a tangentially-related conspiracy involving totally different conduct during a later time period to prove the conspiracy at issue here. The only conceivable basis for doing so is to persuade the jury

_____

[5] On June 30, 2023, the district court granted Defendants' motion for summary judgment and dismissed the Track One Georgia Dock claim as well as the Track One supply reduction claim against Defendants Perdue, Fieldale, Case, Foster, Claxton, Wayne and Agri Stats. R.6641.

that Pilgrim's (and, by extension, the Remaining Defendants) must have engaged in the supply-reduction conspiracies because it participated in an entirely distinct bid-rigging conspiracy. That is not permissible under FRE 404(b)(1).").

The district court agreed with the Defendants, found that bid-rigging is a separate conspiracy from supply reduction, and refused to allow bid-rigging evidence to be introduced at the trial. A.2304-05, R.6819, August 28, 2023 Hearing Tr. at 55:25-56:5 ("[t]he motion in limine to permit introduction of other bad acts, which I read the motion as talking about bid-rigging, not about anything that – well, I read it about ***bid-rigging, which I think has nothing to do with this case***. That is denied. ***You can't put in bid-rigging evidence in this case. That's why we bifurcated these cases***.").

The trial proceeded in accordance with the district court's pre-trial rulings that bid-rigging was not a subject of the Class case, with Class Counsel describing the scope of the case to the jury in opening statements as: "about how Sanderson Farms, Incorporated, agreed with its

coconspirators to limit the supply of chicken in the United States and drive up market prices."  A.2166, 9/18/23 Trial Tr. at 642:12-14.

During the course of the Track One trial, the district court followed its motion in limine rulings and excluded any bid-rigging evidence across the board.  *See, e.g.*, A.2177, 9/21/23 Trial Tr. at 1119:15-16.

After the conclusion of trial, the jury returned a no liability verdict in favor of Sanderson.

## F.    The Restaurants' Motion to Confirm

On September 7, 2023, the Restaurants filed their Motion to Confirm Opt Out Status ("Motion to Confirm").  A.2183, R.6841.  The Restaurants explained that their decision not to participate in the Track One opt out process was because of the district court's two-track structure, the Class's Track One election, and the Restaurants' Track Two election.  *Id.*; *see also* A.2244, R.6868.

The Defendants and the Class opposed the Restaurants' Motion to Confirm.  A.2226, A.2239, R.6863, R.6864.

The district court granted the Motion to Confirm in part and denied it in part ("Motion to Confirm Order"). A.2252, R.6872. The district court held that the Restaurants could continue to pursue their claims against Sanderson and other Defendants that had not settled with the Class (or settled pre-certification) but that the Restaurants were "bound" by five post-certification Class settlements, including the Settlement with Simmons. *Id.*

## G. The Restaurants' Motion for Clarification and Objection to the Settlement

On October 6, 2023, the Restaurants filed a motion to clarify that the portion of the Motion to Confirm Order binding the Restaurants to the post-certification settlements did not apply to the Restaurants' bid-rigging claims ("Motion for Clarification"). A.2254, R.6930.

The Restaurants contended that the Class could not settle a bid-rigging claim that the Class had formally abandoned. The Restaurants argued that if the Settlement were deemed to apply to the Restaurants' bid-rigging claims, it would fail under this Court's fairness, reasonableness, and adequacy test because the Class failed to obtain any consideration for bid-rigging. The Restaurants also asserted that if the Settlement included bid-

rigging, it would create a clear conflict of interest between Class Counsel and the Class Representatives and the Restaurants and other QSR class members. Finally, the Restaurants argued that the Settlement could not extent to bid-rigging because the Class did not seek to certify a bid-rigging claim and the claim arose from a distinct factual predicate. *Id*.; *see also* A.2321, R.7030.

The Class and certain Defendants opposed the Restaurants' Motion for Clarification. A.2282, A.2269, R.6999, 6997. The Class admitted that it received no consideration for the release of the Restaurants' bid-rigging claim. However, the Class argued that because it had abandoned bid-rigging through its Track One election, the bid-rigging claim was valueless. The Class further asserted that when the Restaurants failed to opt out of the Class (after the Class had abandoned bid-rigging), the Restaurants also waived any bid-rigging claim. A.2291, R.6999 at 9. Therefore, according to the Class, it was not necessary for the Class to receive any independent consideration for the bid-rigging claims. *Id*.

While the Motion for Clarification remained pending, the Restaurants objected to the Simmons Settlement on the same grounds as set forth in its

Motion for Clarification (the "Objection"). A.2334, R.7040. The Restaurants also requested an in-person fairness hearing, which the district court granted. R.7057.

On December 11, 2023, the day before the fairness hearing, the district court denied the Restaurants' Motion for Clarification, overruled the Objection, and held that the Restaurants were bound by the Simmons Settlement for all purposes including their Track Two bid-rigging claims (the "Order"). A.0001, R.7083.

The district court conducted the fairness hearing the next day. In support of its determination that the Settlement was fair and reasonable, the district court referenced the extensive analysis and discovery conducted by the Class on the market manipulation claims. A.0021, R.7118 at 5. The district court further described the Class's Settlement result as "extraordinary" in view of its loss to Sanderson at the supply reduction trial. *Id.*

The district court did not mention bid-rigging during the fairness hearing.

On December 12, the district court entered its order granting Final Approval of the Settlement (the "Final Approval Order"). A.0011, R.7085. The Final Approval Order also does not discuss the bid-rigging claim in any respect.

The Restaurants filed a timely notice of appeal on January 5. R.7121.

## Summary of the Argument

The Order and Final Approval Order serve a singular purpose—to save a Settlement with fatal flaws.  The district court seized on the Restaurants' failure to opt out of the Class and used it to excuse Class Counsel from justifying (and the district court from analyzing) the fundamental unfairness, unreasonableness, and inadequacy of a Settlement that releases distinct bid-rigging claims for no consideration.

The Order contains multiple fundamental errors.

The cornerstone of the Order was the district court's determination that the Class could resurrect a bid-rigging claim it formally abandoned and that the district court previously ruled could never be litigated by the Class because of its Track One election.

The district court made this determination notwithstanding that it directly contradicted the "double waiver" argument the Class advanced to justify the failure of the Settlement to obtain any consideration for the Restaurants' bid-rigging claims.  The Class maintained that because it

waived any bid-rigging claim when it elected Track One, the Restaurants also waived their bid-rigging claim when they failed to opt out of the Class.

The district court recognized that the Class's "double waiver" argument did not make sense. The bid-rigging claim either existed or it did not. If the bid-rigging claim was abandoned and could not be pursued as the Class stressed, then there was no claim to settle.

The district court's attempt to resurrect the Class's bid-rigging claim so that the Class could settle it cannot be reconciled with the law and the record in this case and constitutes clear error.

When the district court established its two-track structure, the district court was explicit that the plaintiffs who elected Track One were forever barred from pursuing bid-rigging and "*will not get another bite at the apple after a Track One trial*." A.1201, R.5322 at 11.

This clear direction had profound consequences and guided every plaintiff's litigation decisions, including the Restaurants. Those plaintiffs that did not have bid-rigging claims naturally decided to proceed on Track

One, and those plaintiffs like the Restaurants that did have bid-rigging claims chose Track Two.

In fact, the clear track demarcation that the district court established between Track One and Track Two was the reason the Restaurants did not participate in the Track One certification opt out process. The Restaurants could not opt out of a class they were not a part of.

By electing to proceed on Track One and stipulating that it was abandoning any bid-rigging claim, including any appellate rights, the Class relinquished any ability to pursue bid-rigging as a matter of law. By reversing its prior ruling and now stating that the Class and other Track One plaintiffs could resurrect their bid-rigging claims, the district court has severely prejudiced the Restaurants and every other Track Two plaintiff that has had its case stayed for years. The Order eliminates any distinction between Track One and Track Two and turns the entire case on its head.

The district court's ruling that the Settlement was fair and reasonable is also clear error. In their Motion for Clarification and their Objection, the Restaurants argued that the Settlement could not meet the fairness,

reasonableness and adequacy standards of this Circuit because it did not provide any consideration to the Restaurants for their bid-rigging claims. The Class did not dispute this. Instead, the Class argued that because the bid-rigging claim was waived it was valueless. A.2291, R.6999 at 9 ("that does not obligate Class Plaintiffs in a settlement to obtain separate consideration for claims and issues that are not directly at issue a part of [sic] the Track 1 case. . . . By remaining part of the Class and Track 1, all Class members, including Certain Restaurant DAPs, waived their right to recover for any Track 2 claims.").

Here as well, the district court disregarded the Class's express admissions. The district court held that the Settlement must have provided value for the release of the bid-rigging claim based on the district court's determination that the Class could still pursue bid-rigging notwithstanding its abandonment of the claim. A.0008, R.7083 at 8.

But the district court went further. It recognized that the Class did not attempt to demonstrate that the consideration obtained for the bid-rigging claims was fair and reasonable compared to the potential value of those

claims. The district court ruled that it was not necessary for the Class to do so. Instead, the district court held that it was the Restaurants' burden to offer specific evidence of the value of their bid-rigging claims to establish that the Settlement was unfair. By relieving the Class of its obligation to substantiate the fairness and reasonableness of its Settlement and shifting that burden to the Restaurants, the district court violated the basic precepts of Rule 23(e)(2), and this Court's precedent in *Reynolds*, *Mirfasihi*, and *Synfuel*.

The district court also erred by finding that the Class Representatives and Class Counsel were adequate representatives for the Restaurants' bid-rigging claims. The Restaurants' and the Class Representatives' interests are diametrically opposed. The Class Representatives did not have viable bid-rigging claims which was why Class Counsel elected to proceed under Track One and abandon bid-rigging. It also is for this reason that Class Counsel was willing to sacrifice the Restaurants' and other class members' bid-rigging claims for no consideration. The Class admitted that it released bid-rigging in order to settle the Class's supply reduction claim. This is a classic example of Class Counsel wrongly "selling class members down the river."

The district court's failure to conduct an analysis of whether bid-rigging could be certified under Rule 23 is also clear error. The district court understood that the Class did not seek to certify bid-rigging, and that the Class's expert, Dr. Carter, did not attempt to present a class-wide damages model for bid-rigging. However, the district court rejected the Restaurants' contention that the Settlement could not extend to their bid-rigging claim because bid-rigging was not certified and could not have been certified.

Instead, the district court ruled that there was no authority requiring it to consider individual claims and that its analysis (which was limited to supply reduction) was sufficient to certify the Class for all claims, including bid-rigging.

Here as well, the district court was incorrect, and its ruling violates the clear precedent of the Supreme Court and this Circuit. As this Court held in *Santiago*, "[o]nly by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant." *Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021).

The district court also erred in determining that the Class's certification Notice was sufficient to alert class members that by remaining in the Class, they would give up their individual bid-rigging claims. The exclusion provisions of the Notice were expressly limited to the claims asserted in the Class case. And at the time the Notice was sent, the Class had elected to proceed under Track One and formally abandoned any bid-rigging claim.

Finally, the district court misapplied the law of this and other Circuits on factual predicate. As the basis for its establishment of the two-track structure, and in the lead up to and during the Track One trial, the district court specifically and repeatedly ruled that (i) bid-rigging was a completely separate conspiracy from supply reduction; and (ii) bid-rigging and price-fixing evidence was inadmissible because it did not arise out of the alleged supply reduction conspiracy.

Yet in its Order, the district court concluded that the factual differences between supply reduction and bid-rigging are irrelevant. According to the district court, because the claims were asserted in the same case by the

Restaurants and other plaintiffs, that alone means that supply reduction and bid-rigging arose from the same factual predicate.

The district court was incorrect. The factual predicate standard required that bid-rigging arise from the same integral core of *facts* as supply reduction, and the district court had already determined that bid-rigging was a completely separate conspiracy dependent on different evidence.

## Standard of Review

This Court reviews orders granting final approval of class action settlements for abuse of discretion. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006). However, this Court "insist[s] that district courts exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel Techs. v. DHL Express, Inc.*, 463 F.3d 646, 654 (7th Cir. 2006). "[I]f the district court's analysis turned on an error of law, the court necessarily abused its discretion." *Jamie S. v. Milwalkee Pub. Sch.*, 668 F.3d 481, 500 (7th Cir. 2012).

## Argument

### I. The District Court's Order Resurrecting a Class Bid-Rigging Claim is Contrary to Law.

The Class's invocation of its "double waiver" argument was understandable. It recognized that it did not receive any consideration in the Settlement for bid-rigging and, therefore, had to come up with some explanation for how the Settlement was nevertheless fair to the Restaurants. A.2291, R.6999 at 9 ("[b]y remaining part of the Class and Track 1, all Class

members, including Certain Restaurant DAPs, waived their right to recover for any Track 2 claims.").

The problem with the Class's waiver contention was that it did not make any sense. As the Restaurants explained in their briefing on their Motion for Clarification and their Objection, a claim either exists or it does not. A.2321, A.2334, R.7030, R.7040. The bid-rigging claim could not be waived for purposes of the Restaurants' challenge to the fairness of the Settlement, but still exist for purposes of the Class's ability to settle and release it for nothing. As the Restaurants asserted, such a result would amount to an untenable "heads I win, tails you lose" scenario. A.2326, R.7030 at 5.

The district court also recognized that the Class's waiver argument was a non-starter. So instead, it created its own justification for preserving the Settlement. Directly contradicting its October 2021 Order and its directives at the December 2021 Hearing, the district court ruled that the Class's bid-rigging claim was alive and well. According to the district court,

the fact that the Class abandoned its bid-rigging claim when it elected Track One did not prevent the Class from still pursing bid-rigging.

The district court stated:

> The stipulation to Track 1 constituted a waiver for the practical purposes of no longer pursing bid-rigging in discovery, on summary judgment, or at trial.  But the stipulation was not a dismissal pursuant to Federal Rule of Civil Procedure 41, and it was not a judgment or release.  ***The stipulation may have made re-raising bid-rigging claims more difficult in the context of this case.  But it did not prevent the Class from pursing bid-rigging claims as a matter of law.***

A.0001-02, R.7083 at 1-2.  The district court thus concluded that "***because bid-rigging claims were potentially still available to the Class, the Class could settle those claims***."  A.0002, *Id.* at 2.

The district court's attempt to save the Settlement is indefensible.  The self-contradictory logic the district court advanced in the Order is demonstrated by a simple rejoinder.  ***How?***  How, exactly, could the Class possibly "re-raise" bid-rigging as the district court now suggests?  How, and under what possible circumstance (which the district court conceded was "difficult"), could the Class continue to prosecute bid-rigging if it was "no

longer pursing bid-rigging in discovery, on summary judgment, or at trial?" How could the district court say that the Class could prosecute bid-rigging after expressly and repeatedly instructing all Track One plaintiffs that they could never do so?

The Court established two groups of claims and required the plaintiffs to make a choice. The Class (and several opt out plaintiffs) chose to abandon their bid-rigging claims and pursue only a claim for supply reduction. The choice for the Restaurants was easy. They chose Track Two because bid-rigging is the central component of their claims in this case.

Indeed, the strict demarcation between Track One and Track Two was what caused the Restaurants not to participate in the Track One certification opt out process in the first place. As the district court made clear, no party could be in two tracks at the same time. There was perhaps no better example of the separation of claims than the district court's requirement that a separate consolidated complaint be filed to govern the Track Two cases alleging the bid-rigging conduct. A.1186, R.5305.

The Order offers no insight into the district court's "resurrection" pronouncement, or the Pandora's box it creates.  If Track One plaintiffs retained a bid-rigging claim, then there is no difference between Track One and Track Two, and the Court's two-track protocol has no purpose whatsoever.  In fact, under the district court's new ruling, the Class and all other Track One plaintiffs that abandoned bid-rigging (and appellate rights) as a pre-condition to selecting Track One are now permitted to bring a bid-rigging claim against Sanderson tomorrow.

But again, how can that possibly be when the district court said at the December 20, 2021 hearing that "***Track One will not get another bite at the apple after a Track One trial***, meaning you can't try a – ***if you're in Track One, that will be your only trial***.  If you want to allege bid rigging as part of an overall conspiracy or as some other type of your case in chief, go to Track Two."  A.1201, R.5322 at 11.  The Court explained that "Defendants are going to have to defend many trials, but they shouldn't have to defend multiple trials against the same plaintiffs."  A.1202, *Id*. at 12.

Indeed, flipping the script at this juncture as the district court has done means that every Track Two plaintiff has been denied basic due process. According to the district court's new ruling, there was no reason for any plaintiff to choose Track Two. Why agree to a three year stay when they could "get another bite at the apple" and still pursue bid-rigging as a Track One plaintiff?

The district court's explanation that the Class's abandonment of bid-rigging did not constitute a Rule 41 dismissal "as a matter of law" fares no better. If a plaintiff forever abandons the right to take discovery, engage in dispositive motion practice, and go to trial on a claim, then there is no claim to pursue.

The law is in accord. When a party demonstrates an intent to abandon a claim it is tantamount to a dismissal. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719, 721 (7th Cir. 2011) ("litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"); *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (plaintiff could not pursue appeal of abandoned claim after failing to address defendant's argument at

summary judgment); *Morris v. City of Rockford*, No. 3:20-cv-50384, 2021 WL 5113890, at *2 (N.D. Ill. Nov. 3, 2021) (dismissing claim where plaintiff continued to litigate but failed to respond to motion to dismiss because plaintiff's actions "evidence[d] a conscious decision to abandon the claim"); *Donnelly v. Am. Express Bank FSB,* No. 18-cv-1024-GPC-WVG, 2018 WL 4759206, at *4-5 (S.D. Cal. Oct. 2, 2018) (plaintiff's pre-trial "actions served as an abandonment of its claims akin to a dismissal" and noting that "[w]hile the acts constituting an abandonment vary among [] cases . . . [r]equiring [plaintiff] to abandon its claim in a specific manner would ignore the fact that the requisite abandonment can be found in any affirmative expression to the court of an intent to abandon the claim."); *Dodson v. Pan Pac. Retail Props., Inc.*, No. S–02–258 WBS/KJM, 2003 WL 25656778, at *1 n.2 (E.D. Cal. June 12, 2003) ("pre-trial statement [that] clearly states that plaintiff abandoned his claim for injunctive relief" operated as an abandonment as a "practical matter").

The Fourth Circuit's decision in *In re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg. Sales Practices and Prods. Liab. Litig.*, 91

F.4th 174 (4th Cir. 2024) is on all fours. The plaintiff had brought a wrongful death action against the defendant. After removal to the district court handling a class action involving the same defendant, the district court dismissed the plaintiff's case as precluded by a settlement reached in the class action. *Id*. at 179-80.

Reversing the district court's order, the Fourth Circuit held that the class could not settle a claim it had made clear it was not pursuing. *Id*. at 185. "Important here, the settlement class representative at least twice made clear that they were not pursing personal injury claims on a class-wide basis." *Id*.; *see also Woodson v. Folton*, 614 F.2d 940, 942 (4th Cir. 1980) (plaintiff's claims could not be settled by release when the district court "explicitly ruled that the class action would not address issues arising from allegedly discriminatory discharges.").

Here, the Class's abandonment of bid-rigging was even more explicit. The Class expressly stipulated twice that it was relinquishing bid-rigging, including any appellate rights, as the district court required.

The district court was correct that the bid-rigging claim had to be viable in order for the Class to be able to settle it. But the district court's attempt to create that viability through its "resurrection" analysis cannot be reconciled with the law and its own ground rules on the two-track case structure that has dictated and shaped how this litigation has proceeded.

## II. The District Court's Determination that the Settlement is Fair, Reasonable, and Adequate is Fundamental Error and Must be Reversed.

Rule 23(e)(2) and this Court's well-established precedent makes clear that approval of a class action settlement may only be granted if a settlement is fair, reasonable, and adequate. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002).

As Judge Posner stated in *Reynolds*, district judges are required to "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. . . . We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Id.* at 279-80; *see also Mirfasihi*, 356 F.3d at

785 ("because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole.").

The district court abused its discretion by approving the Settlement without conducting a proper fairness analysis. And as in *Reynolds*, the district court also "did not give the issue of the settlement's adequacy the care that it deserved." 288 F.3d at 280.

> ### A. The District Court's Conclusion that the Class Received "Value" for the Restaurants' Bid-Rigging Claim is Unsupportable and Violates Established Law on Conflict of Interest and Adequacy of Representation.

The "most important factor relevant to the fairness of a class action settlement" requires the district court to measure the strength of the claims released against the value of the settlement received. *Synfuel*, 463 F.3d at 653.

The "value received" calculation here is straightforward. The Class admitted that it received no consideration for the Restaurants' bid-rigging claims. This again is the reason why the Class came up with its "double

waiver" argument. A.2291, R.6999 at 9 ("that does not obligate Class Plaintiffs in a settlement to obtain separate consideration for claims and issues that are not directly at issue a part of [sic] the Track 1 case. . . . By remaining part of the Class and Track 1, all Class members, including Certain Restaurant DAPs, waived their right to recover for any Track 2 claims.").

In fact, the Restaurants' purchases were never a subject of the Settlement substantively or quantitatively for any purpose. As Dr. Carter admitted, his damages analysis which the Class and Simmons said formed the basis for their Settlement "excluded the value of purchases made by

those individuals and entities that have filed direct action lawsuits." A.0861, R.3990-122 at ¶187; *see also* A.2229, R.6863 at 4.[6]

But just as it did with the Class's "double waiver" argument, the district court walked back the Class's admission on lack of consideration. *See* A.0007-08, R.7083 at 7-8 ("Class's concession that the bid-rigging claims were not a 'focus' of settlement negotiations does not mean the value of those claims was not considered, and certainly not that they were released for 'nothing.'").

Using its new "resurrection" finding, the district court created Settlement "value" for the Restaurants' bid-rigging claims where none existed. The district court ruled that the "value" the Class obtained for bid-

---

[6] The total class purchases set forth by Dr. Carter were approximately $18 billion. If the Restaurants' $8 billion in purchases had been considered, they would have accounted for over a third of the total Class purchases. Indeed, the Class and Defendants also expressly acknowledged the Restaurants' opt out status well after the exclusion deadline. At the district court's direction, they created a detailed chart setting forth the Restaurants' active Track Two claims. A.2183, R.6841 Ex. B. The Class, Defendants, and the Restaurants continued to refine the chart as late as June 13, 2023—*two weeks after* the preliminary approval motion was filed. *Id.*; *see also* A.1833, R.6596; A.1854, R.6597.

rigging was the supply reduction Settlement itself. Indeed, the Order applauded Class Counsel for using the Restaurants' and other class members' bid-rigging claim as leverage to settle the supply reduction claim that was presenting "difficulties."

> Absent Class Counsel's decision to push the case forward along Track 1, and not pursue the bid-rigging claims, it is unlikely settlement would have occurred here. . . . The Class's settlements with all defendants but the one that went to trial demonstrates that Class counsel recognized the difficulties in this case. The settlement amount certainly accounts for this difficulty.

A.0008-09, *Id.* at 8-9.

The district court's reasoning endorses a textbook conflict of interest that runs headlong into this Circuit's law on fairness and adequacy of representation.

Selling out certain class members for no recovery in order to get a "deal done" is precisely what this Court and others have admonished against time and time again. *Mirfasihi*, 356 F.3d at 782-83, 85 (holding that settlement where certain members of the class "received absolutely nothing, while surrendering all its members' claims . . . sold these [] claimants down the

river."); *Nat'l Super Spuds, Inc., v. N.Y. Mercantile Exch.*, 660 F.2d 9, 19 (2d Cir. 1981) ("[a]n advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class."); *Remijas v. Neiman Marcus Grp., LLC*, 341 F. Supp. 3d 823, 829 (N.D. Ill. 2018) (decertifying settlement class where "inevitable conflict" existed between interests of two subclasses causing the Court to "question" whether little to no relief obtained for one subclass "constitute the relief that an adequately represented [] subclass would seek to recover.").

Tellingly, the Order does not contain a Rule 23(a)(4) analysis addressing how Class Counsel and the Class Representatives could adequately protect the interests of the Restaurants and other class members who have bid-rigging claims. Instead, the district court concluded that the Restaurants have no reason to complain and dismissed their conflict of interest position as "unsophisticated" and mere "conjecture" because the Restaurants "will recover equally with all other class members." A.0009-10, R.7083 at 9-10.

The fact that the Restaurants will be treated no differently than other class members without viable bid-rigging claims is precisely the issue. The inequity of the Restaurants not receiving any additional compensation for their bid-rigging claims is highlighted by the district court's recognition that "[a]ll parties in this case were well aware of the bid-rigging claims and their potential merits and value." A.0008, R.7083 at 8.

As the Supreme Court held in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999), where all claimants are treated equally despite some having different claim values, Class Counsel's "very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that [the disparate claimants] would have chosen." *See also Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 627-28 (1997) (affirming rejection of settlement where "interests of those within the single class are not aligned" and finding court's assessment that named plaintiffs did not operate "under a proper understanding of their representational responsibilities" was "on the mark"); *Reynolds*, 288 F.3d at 282, 284 (observing an "unremarked conflict of interest within the class" between two

sets of class members, one of which with "potentially substantial claims" that "will receive no compensation for the additional damages that they incurred.").

Achieving a market manipulation settlement by releasing a bid-rigging claim for nothing might have made perfect sense for Class Counsel and the Class Representatives who did not have a bid-rigging claim worth pursuing. But Class Counsel and the Class Representatives had an obligation to the Restaurants and other class members who did have valid and viable bid-rigging claims. *Amchem*, 521 U.S. at 625-26 ("[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-54 (2d Cir. 2011) (vacating district court's approval of settlement for failure to satisfy Rule 23(a)(4) where there was "'disparate interests' within the class" resulting in a "risk of fundamental conflict among subgroups" which could cause the "selling out of one

category of claim for another."); *Soranno v. New York Life Ins. Co.*, No. 96 C 7882, 2001 WL 290303, at *4 (N.D. Ill. Mar. 20, 2001) ("named plaintiffs . . . 'cannot represent a class of whom they are not a part,' and can only represent a class of whom they are a part 'to the extent of the interests they possess in common with members of the class. This means that named plaintiffs have no authority to release claims beyond those that are common to the class.") (quoting *Nat'l Super Spuds*, 660 F.2d at 9, 17-19)).

Here as well, there is a deep divide between the class members like the Restaurants with bid-rigging claims and the Class Representatives and other class members who do not have those claims. And, while Class Counsel dismisses the Restaurants as disgruntled class members who did not opt out, Class Counsel owed the "disgruntled" Restaurants the same fiduciary duty to maximize their recovery as they owed to all other class members.

The district court's Order excuses Class Counsel's disregard of the Restaurants for the benefit of the Class as a whole. This ruling was clear error, and only accentuates the conflict of interest that dooms the Settlement.

**B.    The District Court Improperly Shifted the Burden to the Restaurants to Demonstrate the Unfairness of the Settlement**.

The district court's Rule 23(e) findings constitute error for an equally fundamental reason.    The burden of establishing the fairness and reasonableness of a proposed class settlement rests with the proponent, the Class.  *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1126 n.30 (7th Cir. 1979).

Yet here the Class did not even attempt to justify the fairness or reasonableness of its Settlement that purports to include the Restaurants' bid-rigging claims.  Again, the Class's position was that the Restaurants' bid-rigging claims were valueless because they waived their claims by failing to opt out after the Class abandoned bid-rigging.

In fact, during the entire approval process, the Class never mentioned the value of the bid-rigging claim.  Rather, the motion for final approval was limited exclusively to touting Class Counsel's zealous pursuit of the market manipulation claims:

> The completeness of the factual and legal record
> allowed Co-Lead Class Counsel to thoroughly assess

the strength of Plaintiffs' claims and the Settling Defendants' defenses, and the substantial benefits that the Settlements would provide to the Class. . . . Moreover, the voluminous discovery and investigation performed before the Settlements were entered ensured that DPPs and their counsel made informed decisions to approve and recommend the Settlements to the Class and the Court. The Settlements were entered into after DPPs had the opportunity to take dozens of depositions, analyze millions of documents, and engage in extensive written discovery. (*See* Pouya Decl. ¶¶ 4-7.) Therefore, the procedural posture and status of the case supports granting final approval to the Settlements.

A.2383-84, R.7052 at 16-17; *see also* A.1845-46, R.6596 at 9-10; A.1854, R.6597 at ¶10.

The district court's analysis of the Settlement at the fairness hearing also was confined strictly to the Class's market manipulation claims. A.0017, R.7118. The district court concluded that the Settlement constituted a "significant amount[] of money" particularly considering that the Class could have "walked away empty-handed" as the Sanderson supply reduction trial demonstrated.

The stage of the proceedings, the amount of discovery supports final approval. These cases

settled shortly before trial.  Plaintiffs' counsel knew exactly what the evidence they had that was available that they could've used for trial.  They evaluated the strength of the case in light of that evidence and—just as defense counsel did—and made a decision that the settlement was in the best interest of the class.  This was not a settlement reached very early in the case before there could be a fair evaluation of the evidence.  In addition to the evidence, certainly there were written discovery; there were numerous depositions taken.  There were—they had the benefit of knowing the Court's evaluation of the evidence in a lengthy summary judgment opinion that was entered.

A.0022-23, *Id.* at 6-7.

Like the Class's motion for final approval, the district court operated as if the bid-rigging claim was not a subject of the Settlement.  There was no discussion of any kind of the evidence that supported the bid-rigging claim, let alone the strength of the claim.  In fact, again, like the Class's motion, bid-rigging was not mentioned at any time either at the fairness hearing or in the Final Approval Order.

Instead, the district court's entire analysis regarding the substance of the bid-rigging claim is relegated to one statement in the Order that "[a]ll

parties in this case were well aware of the bid-rigging claims and their potential merits and value." A.0008, R.7083 at 8.

But the district court's Order went further. It shifted the burden to the Restaurants to demonstrate how the Settlement was *unfair*. The district court stated that the Restaurants "make no argument about what recovery amount would sufficiently account for the bid-rigging claims. The Court cannot find that the settlement does not provide a substantial recovery without some analysis as to how the recovery amount fails to fairly compensate the Class for releasing their claims, including the bid-rigging claims." A.0007, *Id.* at 7.

The district court's conversion of the Rule 23(e)(2) standard into a presumption of fairness in favor of the Class that the Restaurants had to refute is improper and contrary to the law. *In re Gen. Motors Corp.*, 594 F.2d at 1126 n.30 (burden of persuasion improperly shifted to objectors where trial court "accepted the proposed settlement as Prima facie fair and shifted to the objectors . . . the burden of producing evidence disproving the fairness of the settlement."); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir.

2013) ("to the extent the parties here argue that the settlement was fair . . . it was the parties' burden to prove the fact, rather than [the objectors'] burden to disprove it.").

Moreover, the suggestion that the Restaurants—who are in the midst of a years-long discovery stay—were required to conduct a full-bore damages analysis to substantiate a precise dollar value for their bid-rigging claim holds the Restaurants to a standard not required of any objector, or even a settlement proponent.

The district court's statement criticizing the Restaurants for not establishing how their bid-rigging claims are "more valuable than the other class members' supply reduction claims" moves the goal post even further in the wrong direction. The relative strength of the two claims is irrelevant. The question for the Rule 23(e) analysis is more fundamental: do the Restaurants' bid-rigging claims have *any* independent value such that *some* consideration was needed to settle them? If the answer is yes, then the Settlement—which the Class admitted provides no independent consideration for the Restaurants' bid-rigging claims—cannot be approved.

Improper burden shifting aside, the district court's statement that the value of the bid-rigging claims was not "readily apparent" is also wrong. A.0009, R.7083 at 9. As the district court itself acknowledged in the Order, "[a]ll parties in this case were well aware of the bid-rigging claims and their potential merits and value." A.0008, *Id.* at 8.

The Restaurants (and over 100 other direct action plaintiffs) elected Track Two and have been willing to wait over three years to pursue a bid-rigging claim. They would never have done so if bid-rigging had no value.

Moreover, even without the benefit of any discovery, the Restaurants established the strength of their bid-rigging claim in painstaking black and white detail. In both their Motion for Clarification and Objection, the Restaurants made clear that bid-rigging is the subject of multiple criminal Indictments, a guilty plea, hundreds of millions of dollars in criminal fines, and an amnesty application. A.2254, A.2334, R.6930, R.7040.

The Restaurants then referred the district court to 65 pages of allegations in the Track Two Complaint detailing the specific nature of the bid-rigging conduct, including (i) a litany of direct quotes from the

Defendants' emails; and (ii) the criminal trial testimony of former Pilgrim's employee Robbie Bryant—who admitted that the aim of the bid-rigging conspiracy was to artificially inflate contract prices paid by QSR customers like the Restaurants (several of which he referenced by name). A.1268, R.5455 at ¶¶874-1109. As Judge Brimmer found, Mr. Bryant's testimony was "sufficient to support a finding *beyond a reasonable doubt* that a conspiracy existed . . . ." A.2719, *United States v. Penn*, No. 20-cr-00152-PAB, 2022 WL 124755, at *3.

The fact that the district court declined to consider these facts in connection with its Rule 23 analyses further confirms the results-based reasoning of the Order.

**III.** **The District Court's Ruling that the Class Could Settle an Uncertified Bid-Rigging Claim Was Clear Error**.

**A.** **The Order Violates the Supreme Court's Holdings in *Amchem* and *Comcast*.**

In their Motion for Clarification and Objection, the Restaurants asserted two fundamental tenets of Supreme Court jurisprudence.

First, *Amchem* holds that a class claim cannot be settled unless it meets the requirements of Rule 23. *Amchem*, 521 U.S. 591 at 593 ("[t]he dominant concern of Rule 23(a) and (b)—that a proposed class have sufficient unity so that absentees can fairly be bound by class representatives' decisions— persists when settlement, rather than trial is proposed.").

Second, *Comcast* requires that for a claim to be certified, the expert's class-wide damages model must specifically address and "fit" the theory of harm alleged by the Class. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013) (expert's model "no longer fits Plaintiffs' sole theory of antitrust impact and instead, produces damages calculations that are not the certain result of the wrong."); *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016) ("the damages theory must correspond to the theory of liability.").

Applying this law to the Settlement requires either that the Settlement be properly limited to exclude bid-rigging claims that were never certified, or that the Settlement be vacated in its entirety.

Consistent with its Track One election, Class Counsel never sought to certify bid-rigging. Class Counsel understood that because of the targeted

nature of the conspiracy, not every chicken purchaser was a victim, and thus bid-rigging would jeopardize certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("common contention, [] must be of such a nature that it is capable of classwide resolution . . . . Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."); *Santiago*, 19 F.4th at 1018 ("[i]f, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.").

It is for this reason that the Class's Certification Motion was strictly limited to the market manipulation conduct that the Class argued could be resolved on a class-wide basis. A.0894, R.3990 at 27 (the "central allegation in the case is that Defendants illegally conspired to restrict supply and increase prices of Broilers. Proof of this conspiracy will be common to all Class members.").

To satisfy *Comcast*, the Class relied on the work of Dr. Carter. Dr. Carter made clear that his damages model was only tethered to the Class's

supply reduction and Georgia Dock theories of liability.  A.0912, R.3990-122 at ¶196 ("I conclude that established economic methodologies and other common evidence support the allegation that Defendants conspired to raise and fix prices for broilers within the United States through supply restrictions and fabricating control of the Georgia Dock Price index.").  Like the Class, Dr. Carter did not consider bid-rigging in any respect.

The Certification Order, in turn, identified the "two primary common questions" in the Class case as: "(1) whether Defendants engaged in a conspiracy to reduce supply to increase price; and (2) whether this conspiracy caused Plaintiffs to suffer injury."  A.1774, R.5644 at 12.  The district court then evaluated Dr. Carter's opinion and concluded that "a conspiracy to restrict supply caused Broiler prices to increase and that this can be shown by evidence common to the class."  A.1779-80, *Id.* at 17-18.

The district court found that Dr. Carter's methodology satisfied *Comcast*.  The Certification Order held that "Carter's method identifies a significant decrease in supply and, as will be discussed below, a corresponding price increase which he demonstrates cannot be explained by

market factors, like corn prices and the Great Recession. Unsurprisingly, this analysis neatly fits the Plaintiffs' claims and theory of harm. There is no *Comcast* problem here." A.1788, *Id.* at 26.

Like the Class's motion and Dr. Carter's report, nowhere in the Certification Order did the district court address whether bid-rigging was a predominant question common to all class members, or whether Dr. Carter's damages model fit a bid-rigging theory of liability. Indeed, again like the Class's motion and Dr. Carter's report, the Certification Order does not mention bid-rigging in any respect.

In its Motion for Clarification and Objection, the Restaurants explained that under *Amchem*, the bid-rigging claim was required to pass Rule 23 and *Comcast* scrutiny before it could be settled. A.2254, A.2334, R.6930, R.7040.

Yet here as well, the district court disregarded clear Supreme Court precedent. The district court acknowledged that a "court determines whether a 'class' can be certified under Rule 23 by analyzing the relationship between the alleged class and its claims," but then ruled that "claims are not certified under Rule 23." A.0005-06, R.7083 at 5-6. The district court stated

that there was "no authority limiting a certified class to the claims that the court expressly analyzed in its certification opinion," and concluded that its certification analysis—which was limited to supply reduction—was sufficient to certify a "Class" for all claims, including bid-rigging. A.0006-07, *Id.* at 6-7.

*Amchem*, *Comcast*, and this Court's precedent teaches precisely the opposite. In *Santiago v. City of Chicago,* for example, this Court rejected the notion that a district court may skip a certification analysis tailored to specific claims. 19 F.4th at 1017-18. Vacating the certification order for failure to "engage in the detailed analysis that a rule 23 decision requires," the Court held that the district court "never made clear which claims the [certification] analyses refer to." *Id.* The Court explained that these "clarity issues" were a "fatal flaw" in the district court's analysis:

> *[T]he district court should have begun its analysis with the elements of these claims.* Then it could have more clearly framed within those elements what it deemed to be the common and individual issues. By juxtaposing them in that way, the district court's predominance inquiry would have better 'train[ed] on the legal or factual questions that qualify each class member's case as a genuine

controversy.' ***Only by properly circumscribing the claims and breaking them down into their constituent elements can a district court decide which issues are common, individual, and predominant.***

*Id.* at 1018; *see also Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339-40 (7th Cir. 2023) (district court abused its discretion by conducting "scant analyses" and holding it "should have identified the elements of [plaintiff's] two claims and separately analyzed them to better understand the relationship between each claim's common and individual questions.").

As this Court explained in *Simpson v. Dart*, "class certification is not an all-or-nothing proposition. Certification may be appropriate as to some of the class's claims but not others. This observation flows from the text of Rule 23 itself: an order certifying a class 'must define the class *and the class claims, issues, or defenses*.'" 23 F.4th 706, 713 (7th Cir. 2022) (emphasis in original). This Court continued: "[i]f a class's definition was synonymous with its claims, this language would be superfluous. Instead, the 'class' takes its definition from the people in it and the period of time during which the relevant conduct occurred, and ***the 'class claims' are the legal claims for***

*which the class satisfies all of Rule 23's certification requirements*." *Id.; see also Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006) ("the requirement of Rule 23(c)(1)(B) that a certification order 'define the class and the class claims, issues, or defenses,' means that the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis.").

The district court's reference to "strong authority affirming releases of class claims beyond the claims brought in the class complaint" does not excuse the district court's failure to comply with the requirements of Rule 23. Each of the cases the district court cites (from the Class's briefing) involve broad releases of unasserted claims that were later brought under a different statute or in a different venue (i.e. state court), but that arose out of the same core facts as the claims that were the subject of the class litigation. They did not address certification in any form let alone the Supreme Court's decisions in *Amchem* and *Comcast*. *See, e.g., In re Brand Name Prescription Drugs*

*Antitrust Litig.*, No. 94 C 897, 1996 WL 167347, at \*2-3 (N.D. Ill. Apr. 4, 1996) (upholding settlement that released "all claims, asserted and unasserted, which arise out of the pricing practices that have been the subject of this class action" and noting "the same factual predicate—differential pricing—was employed in the conspiracy claims alleged by the class.").

Here by contrast, the Class had no intention of ever litigating bid-rigging. A week after the Class co-opted the Restaurants' bid-rigging allegations for purposes of the Class's Fifth Amended Complaint, Class Counsel made the specific determination not to seek certification of bid-rigging. And then, of course, the Class affirmatively abandoned the claim in its Track One election.

It is for this reason that the district court's ruling that a court "certif[ies] classes not claims" cannot be condoned. Under the district court's standard, class lawyers would have a roadmap for an end-run around *Comcast*, *Amchem*, *Santiago* and its progeny, and Rule 23 itself: (i) assert a panoply of legal theories; (ii) move to certify only the theory for which an expert could provide a class-wide damages model; and (iii) then immediately settle the

larger swath of alleged claims that could never be certified through the back door of a broad release.

The district court's interpretation of the requirements of Rule 23 and certification is not the law, and its determination that the Class could settle a bid-rigging claim without meeting the requirements of Rule 23 was fundamental error.

**B.      The District Court's Finding that the Class Notice Was Sufficient Was Error**.

Rule 23(c)(2)(B) requires a notice to "clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a Certified Class member may enter an appearance through an attorney if the member so desires; and (v) the binding effects of a class judgment on members under Rule 23(c)(3)."

The Class Certification Notice failed to meet these requirements and was deficient. Nowhere does the Notice alert class members that a failure to opt out of the Class results in a waiver of class members' bid-rigging claims.

In fact, like the Certification Motion, Dr. Carter's reports, and the Certification Order, the word "bid-rigging" is not mentioned in the Notice.

What the Notice does say (twice) is "[u]nless you exclude yourself . . . you cannot sue, continue to sue, or be a part of any other lawsuit against the Non-Settling Defendants and their affiliates *that pertains to the claims in this case*."  A.1818, R.6195 at ¶8; *see also* ¶11 ("[u]nless you exclude yourself, you give up the right to sue the Non-Settling Defendants for the claims set forth *in the litigation*.").

But the Class abandoned bid-rigging well before certification. Thus bid-rigging was expressly ***not*** a claim in the Class case.

In its briefing on the Motion for Clarification, the Class doubled down on its contention that the Notice was proper.  To support its "double waiver" argument that was the central thrust of its opposition, the Class contended that "before the Class was certified the Court clearly notified DPPs (and DPPs notified the Class) that if they elected to proceed on Track 1 they would waive bid-rigging claims."  A.2291, R.6999 at 9.

Class Counsel's statement was not true.  The Class never gave *any* notice to putative class members of the district court's two-track structure, let alone that class members would waive a bid-rigging claim.

On November 21, 2023, while the Motion for Clarification was pending, the district court entered a minute order noting that Class Counsels' class notice representation was not supported by a citation. A.2360, R.7046.  The district court then allowed Class Counsel an opportunity to either file the class notice document it was referring to or explain its statement.  *Id.*

Class Counsel did neither.  Class Counsel acknowledged that it never sent notice to class members regarding its Track One election and the purported "waiver" of a bid-rigging claim.  Instead, Class Counsel tap-danced and maintained that "Co-Lead Class Counsel were actually referring to the docket (e.g. "…having elected Track 1…"), not the Class Notice." A.2409, R.7059 at 1.

As the Restaurants observed in their response to the Motion for Final Approval, Class Counsels' suggestion that they satisfied Rule 23's notice

requirement by virtue of the existence of a docket with over 7,000 entries spoke volumes about the insufficiency of the Notice.  A.2416, R.7069 at 4.[7]

But here again, the district court protected Class Counsel.  The district court held that "there is no requirement" that class members be notified of the Class's Track One election, nor was Class Counsel required to make "specific mention of the Class's waiver of bid-rigging claims" in the Notice.  A.0003-04, R.7083 at 3-4.  The district court further stated the Restaurants "provide no authority" holding otherwise.  *Id.*

That also is not correct.  The Restaurants referred the district court to this Court's decision in *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980).  *Oswald* requires that where **known claims** which are not pending before the Court are being released by a settlement, explicit notice of the release of those

---

[7] Additionally, the Class website—which the Notice directs class members to "if you are still not sure if you are included"—does not contain the Court's October 15, 2021 Order, the December 20, 2021 hearing transcript, Class Counsels' December 21, 2021 election to proceed on Track One, or any other document that explains the two-track structure, the election, or the bid-rigging                                                                        claim. https://www.broilerchickenantitrustlitigation.com/Home/CourtDocuments

claims must be provided to class members. This is consistent with Rule 23(c)(2)(B)'s requirement that class members be appraised of the "nature of the action" the "class claims" at issue, and the "binding effect of a class judgment."

The district court stated that even if specific notice was required, the Restaurants "received it because they are active parties in this case." A.0004, R.7083 at 4. But, it is precisely because the Restaurants are active participants in this litigation and have a clear understanding as to (i) the Two Track structure and (ii) "all actions taken by Class Counsel in this case and the context in which those actions were taken," that the Restaurants made the determination that it was not appropriate to participate in the Track One opt out procedure. A.0004, R.7083 at 4. The Notice's failure to mention bid-rigging and limit its scope to the claims in the Class's case was entirely consistent with the Court's directive that Track One did not include plaintiffs who elected to pursue bid-rigging under Track Two.

The district court's willingness to absolve Class Counsel of its basic notice requirements to class members—particularly where the Class sought

to settle and release a claim it abandoned—further underscores the district court's error.

**IV.    The District Court's Factual Predicate Determination Misapplies the Law and Contradicts its Prior Orders and Evidentiary Rulings at the Supply Reduction Trial**.

This litigation has operated under one undeniable premise articulated best by the district court itself—the bid-rigging conspiracy "***has nothing to do with***" the supply reduction conspiracy.  A.2035, R.6819 at 56.

Again, since the Restaurants first alleged bid-rigging, the Defendants, including Simmons, fought to keep bid-rigging isolated from the market manipulation claims.  Their first effort was to bifurcate the claims in order to "keep separate cases separate."  A.0671, 76, R.3688 at 8, 13 ("[t]he New DAPs allege that certain suppliers *coordinated* the *prices* at which they offered to *sell* specific Broiler products to *specific customers*, all of which were restaurants.  No such allegations appear in any previous complaint.  In fact, across **25,000 allegations** filed to date, none use the words 'bid-rigging.'  Not even once.  If anything, the new claims are at odds with plaintiffs' supply-reduction

case. . . . defendants file this motion now to keep separate cases separate." (all emphasis in original)).

The district court agreed. Indeed, the district court's very rationale for creating the two track structure was its determination that bid-rigging was a completely separate conspiracy from supply reduction and Georgia Dock. As the district court emphasized at the December 20, 2021 hearing, "I'm not splitting claims or improperly depriving plaintiffs of evidence they believe proves up their Count I conspiracy or a separate bid rigging conspiracy, but that's not going to be tried in Track One. That is what I intended." A.1201, R.5322 at 11.

The district court reiterated its conclusion that bid-rigging was a separate conspiracy from supply reduction and Georgia Dock at the motion in limine hearing in advance of the Sanderson trial. The Defendants argued that the Track One "[p]laintiffs should be barred from attempting to use a tangentially-related conspiracy involving totally different conduct during a later time period to prove the conspiracy at issue here. The only conceivable basis for doing so is to persuade the jury that Pilgrim's (and, by extension,

the Remaining Defendants) must have engaged in the supply-reduction conspiracies because it participated in an entirely distinct bid-rigging conspiracy. That is not permissible under FRE 404(b)(1)." A.1936, R.6708 at 35.

The district court again agreed and refused to allow bid-rigging evidence to be introduced at the supply reduction trial. The district court held that "[t]he motion in limine to permit introduction of other bad acts, which I read the motion as talking about bid-rigging, not about anything that –well, I *read it about bid-rigging, which I think has nothing to do with this case*. That is denied. *You can't put in bid-rigging evidence in this case. That's why we bifurcated these cases*." A.2034-35, R.6819, August 28, 2023 Hearing Tr. at 55:25-56:5.

The district court's evidentiary rulings during the course of the Track One supply reduction trial were equally clear. As one example, the district court refused to allow into evidence a 2015 email from Chan Windham of House of Raeford in which he stated "I don't think we should mention talking to our competition about pricing. That's just a little illegal." The

court determined that the email was inadmissible because it was referring to price-fixing, not coordinated supply reduction. "I reviewed the transcript relating to it, and they're certainly not talking production." A.2177, September 21, 2023 Trial Tr. at 1119:15-16.

Notwithstanding its clear and recurring directives, the district court rejected the Restaurants' identical factual predicate argument that the Settlement release was overbroad because the bid-rigging claim did not arise out of the same integral core of facts as the market manipulation claims.

Without citation to authority, the district court stated that "evidentiary differences between two claims does not mean that those claims cannot arise out of the same transactions or occurrences." A.0005, R.7083 at 5. Rather, the district court created its own standard for factual predicate—whether the "claims [could] be brought in the same case." *Id.* The district court then referenced the fact that the Restaurants "themselves brought bid-rigging claims together in the same complaints with supply reduction claims." *Id.*

The district court's interpretation of the identical factual predicate rule was incorrect. In fact, the rule means exactly what it says. In order for a

claim to fall within the identical factual predicate rule, it has to arise out of

the identical core of integral ***facts*** at issue in the class action. *Williams v. Gen.*

*Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 273-74 (7th Cir. 1998) (settlement may

release claim "based on the identical factual predicate as that underlying the

claims in the settled class action"); *Elna Sefcovic LLC v. TEP Rocky Mountain*

*LLC*, 807 F. App'x 752, 765 (10th Cir. 2020) ("[w]hen considering the

permissibility of a release, the overlap between elements of *claims* is not

dispositive. Instead, we focus on the factual predicate of the settled claims."

(emphasis in original)); *Lumber Liquidators*, 91 F.4th at 183 ("in order to have

an identical factual predicate, the claims must 'depend upon the very same

set of facts'" and noting that "to authorize and approve a class settlement

that seeks to settle materially distinct and non-litigated claims goes too far."*)*;

*Literary Works*, 654 F.3d at 248 (finding released claim must be "based on the

identical factual predicate as that underlying the claims in the settled class

action" and considering whether a "trial of this case would determine" the

injuries underlying the objectors' claim); *Wal-Mart Stores, Inc. v. Visa U.S.A.,*

*Inc.*, 396 F.3d 96,106 (2d Cir. 2005) ("[p]laintiffs' authority to release claims is

limited by the 'identical factual predicate' and 'adequacy of representation' doctrines. Together these legal constructs allow plaintiffs to release claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement.").

Thus, contrary to the district court's position, the factual predicate determination hinges on the very "evidentiary differences between the two claims" that the district court acknowledged and then dispensed with. Indeed, it is specifically because bid-rigging evidence was ***not*** admissible in the supply reduction trial that bid-rigging cannot arise under the same factual predicate as supply reduction. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560, 563 (9th Cir. 2018) (refusing to recognize an identical factual predicate in light of "facts which [plaintiff] must prove in this action and which would have been unnecessary in the [settled] action."); *Burgess v. Citigroup Inc.*, 624 F. App'x 6, 9 (2d Cir. 2015) ("distinct claims that depend 'upon proof of further facts' constitute a 'separate factual predicate.'"); *Arandell Corp. v. Xcel Energy, Inc.*, Nos. 07-cv-076-wmc, 09-cv-240-wmc, 2022 WL 2314717, at *4 (W.D. Wis. Dec. 27, 2022) (independent

action not barred by prior class action where "all facts which plaintiff must prove in [the independent] action … would have been unnecessary to prove in the [class action].").

Here, the distinct factual predicate of the bid-rigging claim is even more paramount because the Class affirmatively abandoned bid-rigging when it made its Track One election to proceed solely under the market manipulation conspiracy. *See Lumber Liquidators*, 91 F.4th 174 at 185 (reversing district court's approval of settlement and finding "[i]mportant here, the settlement class representative at least twice made clear that they were not pursing personal injury claims on a class-wide basis."); *Woodson,* 614 F.2d at 942 (plaintiff's claims could not be settled by release when the district court "explicitly ruled that the class action would not address issues arising from allegedly discriminatory discharges" and expressly excluded claims predicated on a different factual universe).

The factual predicate doctrine is intended to protect a plaintiff's due process right to pursue its claim while guarding against piecemeal litigation that could cause a defendant to defend the same claim twice. *Lumber*

*Liquidators*, 91 F.4th at 183 ("as the Supreme Court has recognized, an uncircumscribed ability to settle non-litigated claims would run headlong into 'our deep-rooted historic tradition that everyone should have his own day in court,' and would present serious due process concerns.").

The district court's Order frustrates the very purpose of the identical factual predicate test. The Order bars the Restaurants from pursing a bid-rigging claim that the Class formally abandoned and which the district court ruled had nothing to do with the Class's Track One case.

The result of the Order is that Simmons is the beneficiary of a windfall at the Restaurants' expense. This unjust result is exactly what the factual predicate test is designed to prevent.

## Conclusion

The district court's Order and Final Approval Order cannot be affirmed. The approval of the Settlement that extends to the Restaurants' bid-rigging claims constitutes a demonstrably unfair, unjust, and unnecessary result that rewards Class Counsel for its effort to sell the Restaurants' bid-rigging claims "down the river." Accordingly, the Restaurants respectfully request that the district court's Orders be reversed in all respects.

Dated: February 19, 2024

Respectfully submitted,

By: */s/ Lori P. Lustrin*
Lori P. Lustrin
Robert W. Turken
Scott N. Wagner
**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
1450 Brickell Ave., Suite 2300
Miami, Florida 33131-3456
Telephone: 305-374-7580
Facsimile: 305-374-7593
llustrin@bilzin.com
rturken@bilzin.com
swagner@bilzin.com

*Counsel for Boston Market
Corporation, Bojangles'
Restaurants, Inc. and
Bojangles' Opco, LLC, Golden
Corral Corp., El Pollo Loco,
Inc., Zaxby's Franchising LLC,
Domino's Pizza LLC and
Domino's Pizza Distribution
LLC, Cracker Barrel Old
Country Store, Inc., CBOCS
Distribution, Inc., Barbeque
Integrated, Inc. d/b/a Smokey
Bones Bar & Fire Grill,
Shamrock Foods Company,
United Food Service, Inc., FIC
Restaurants, Inc. d/b/a
Friendly's, The Johnny Rockets
Group, Inc., WZ Franchise
Corp., Captain D's LLC, and
White Castle Purchasing Co.*

**Statement Concerning Oral Argument**

Pursuant to Circuit Rule 34(f), the Restaurants respectfully request oral argument to assist the Court in its resolution of the significant issues raised in this Appeal.

**Certificate of Compliance with FRAP 32(g) and CR 32**

The undersigned, counsel of record for Appellants, furnishes the following in compliance with Federal Rule of Appellate Procedure 32(g):

I hereby certify that this brief conforms to the rules contained in Circuit Rule 32 for a brief produced with a proportionally spaced font. The length of this brief is 13,997 words.

/s/ Lori P. Lustrin
Lori P. Lustrin


**Certificate of Service**

The undersigned counsel hereby certifies that a true and correct copy of the foregoing document was electronically served upon the parties and counsel of record on February 19, 2024.

/s/ Lori P. Lustrin
Lori P. Lustrin

## Certificate of Compliance with CR 30(d)

The undersigned, counsel of record for Appellants, furnishes the following in compliance with Circuit Rule 30(d):

I hereby certify that all materials required by Circuit Rule 30(a) and 30(b) are included in Appellants' Appendix.

/s/ *Lori P. Lustrin*
Lori P. Lustrin

**Attached Required Short Appendix**

APPENDIX

TABLE OF CONTENTS

Required Short Appendix

Appendix Page

Order of The Honorable Thomas M. Durkin
     Filed December 11, 2023 (Docket No. 7083)…………………………..  A0001


Order of The Honorable Thomas M. Durkin
     Filed December 12, 2023 (Docket No. 7085)…………………………..  A0011


Transcript of Proceedings Held December 12, 2023
Final Approval of Settlements with Simmons, Mountaire, and OK Foods
Before The Honorable Thomas M. Durkin
     Filed January 5, 2024 (Docket No. 7118)………………………………  A0017

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | No. 16 C 8637 |
| | Judge Thomas M. Durkin |

**ORDER**

The Court found that the DAPs are bound by the Direct Purchaser Plaintiff Class settlements with Defendants Koch, Simmons, House of Raeford, Mountaire, and OK Foods, because the DAPs failed to opt out of the Class on time. *See* R. 6872. In response, the DAPs have filed a motion for "clarification" that these settlements did not release the DAPs' bid-rigging claims, because the Class "abandoned any bid-rigging claim" prior to the settlements, by choosing to proceed in Track 1 in this case. According to the DAPs, by choosing Track 1, the Class abandoned the bid-rigging claims and so it was not possible for the Class to have settled those claims. The DAPs have also filed an objection to the Simmons settlement in particular, based in large part on the same argument. So, the Court addresses both filings together.

**A.    Waiver**

The Class concedes that it waived its bid-rigging claims when it chose Track 1. *See* R. 6999 at 9 ("[B]efore the Class was certified the Court clearly notified DPPs . . . that if they elected to proceed on Track 1 they would waiver bid-rigging claims. . . . By remaining part of . . . Track 1, all Class members . . . waived their right to recover for any Track 2 claims."). Contrary to the DAPs' argument, however, this does not

A0001

mean that the Class lost the authority to settle those claims. The stipulation to Track 1 constituted a waiver for the practical purposes of no longer pursuing bid-rigging in discovery, on summary judgment, or at trial. But the stipulation was not a dismissal pursuant to Federal Rule of Civil Procedure 41, and it was not a judgment or release. The stipulation may have made re-raising bid-rigging claims more difficult in the context of this case. But it did not prevent the Class from pursuing bid-rigging claims as a matter of law.

Because bid-rigging claims were potentially still available to the Class, the Class could settle those claims. The settlement agreements at issue here include releases broad enough to cover bid-rigging. For instance, the release in the Class's settlement agreement with Simmons covers:

> all claims that have been asserted, or could have been asserted, in the Action against the Simmons Released Parties, including all claims in any way arising out of or relating to the direct purchase of Broilers produced, processed or sold by Simmons or any of the other Defendants or their alleged co-conspirators.

R. 6597-1 (Simmons settlement agreement); *see also*, *e.g.*, R. 6928-1 (Raeford). There can be no dispute that the bid-rigging claims could have been brought in this case; indeed, those claims were part of the Class complaint and the DAPs' complaints. The bid-rigging claims alleged that Defendants conspired to rig bids on contracts for sales of Broilers to direct purchasers. Such claims arise out of and are related to the direct purchase of Broilers produced by Defendants, and so are covered by the releases in the settlement agreements. No rational defendant would settle without language broad enough to have covered all claims, including bid-rigging claims. From a

2

A0002

defendant's point of view, the goal of settlement is to extinguish all claims, whether actual or possible.

Thus, the Class's settlement agreements with Simmons, Koch, House of Raeford, Mountaire, and OK Foods, released the Class's bid-rigging, which reflected the Class's earlier stipulation to Track 1. And because the DAPs failed to opt out of the Class on time and are bound by the Class's settlement agreements, the DAPs are also bound by the agreements' releases of bid-rigging claims.

### B.    Notice

The DAPs make two different arguments that they received insufficient notice about the scope of the Class's claims and the releases. They first argue that Class Members could not have waived bid-rigging claims via Class Counsel's stipulation to Track 1 because no notice was provided to the Class Members. But the DAPs provide no authority for this argument. Putative classes often amend their complaints prior to certification without notice to the class members. That happened several times in this case. Class Counsel's stipulation to Track 1 is the equivalent of an amendment to the complaint, in that it effectively dropped a claim from the case before certification. There is no requirement that the Class Members be given notice of such a decision. Even if there was, the DAPs unquestionably received it because they are not just Class Members but have filed their own complaints in this case and receive notice of the case filings. In fact, the DAPs filed their own stipulation to Track 2 demonstrating they are well aware of the status of the various claims in this case.

Next, the DAPs argue that the Class Notice of the Court's grant of certification should have included specific mention of the Class's waiver of bid-rigging claims. But the DAPs again provide no authority that this was required. And in any event, the Class Notice accurately described the case at that point in time:

> Defendants and their Co-Conspirators conspired to fix, raise, maintain, and stabilize the price of Broilers, beginning at least as early as January 1, 2008. Plaintiffs allege that Defendants implemented their conspiracy in various ways, including via coordinated supply restrictions, sharing competitively sensitive price and production information, and otherwise manipulating Broiler prices, with the intent and expected result of increasing prices of Broilers in the United States, in violation of federal antitrust laws.

*See* R. 6185 at 7. No additional notice was required. And again, to the extent any more specific notice was required, the DAPs received it because they are active parties in this case.

In the end, there is no notice issue here because the DAPs are bound by the releases in the settlement agreements and the DAPs do not argue that they did not receive sufficient notice of the settlement agreements. Notice of the stipulation to Track 1 and notice of the class certification are not relevant to this issue. And in any event, the DAPs had sufficient notice of all actions taken by Class Counsel in this case and context in which those actions were taken.

## B. Overbroad

To argue that the Simmons release is overbroad, the DAPs tap into a recurrent theme in this case that the bid-rigging claims have "nothing to do with" the supply reduction claim and so can not "arise under the same factual predicate." R. 7040 at

4

A0004

13. Both the Court and Plaintiffs made statements to this effect during the pretrial hearings addressing the scope of evidence at the Class's trial. The Court also made statements to this effect in explaining why it was appropriate to split the case into two tracks.

But evidentiary differences between two claims does not mean that those claims cannot arise out of the same transactions or occurrences such that it is appropriate for the claims to be brought in the same case. As discussed, both the supply reduction and bid-rigging claims concern Defendants' sales of Broilers to the Class, with an intent to increase the price for Broilers. This relationship is why the Court permitted all Plaintiffs in this case to amend their complaints to included bid-rigging claims and did not require that those claims be filed in separate cases. At bottom, the DAPs cannot avoid the fact that they themselves brought bid-rigging claims and supply reduction claims in the same complaint, and that they continue to argue that the two claims, along with the Georgia Dock claims, are part of a three-legged "overarching" conspiracy. Thus, the claims are related, and the release is not overbroad.[1]

### C.    Uncertified Claims

The DAPs also argue that the Class cannot settle "uncertified" claims. However, "claims" are not certified under Rule 23. A court determines whether a

---

[1] However, this relatedness for the purposes of joining claims and settlement is no barrier to the Court potentially finding the DAPs have failed to state a claim for an "overarching conspiracy" on the pending motion to dismiss in Track 2.

"class" can be certified under Rule 23 by analyzing the relationship between the alleged class and its claims.

The DAPs real argument is that the Class cannot settle any claims that the Court did not analyze in its opinion granting the class certification motion. But the DAPs cite no authority limiting a certified class to the claims that the Court expressly analyzed in its certification opinion. To the contrary, there is strong authority affirming releases of class claims beyond the claims brought in the class complaint. *See Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980) ("[I]t is entirely proper for the offer to include a release for claims not yet adjudicated. A settlement offer is a compromise and may include release of claims not before the Court")); *Richard's Lumber & Supply Co. v. U.S. Gypsum Co.*, 545 F.2d 18, 20 (7th Cir. 1976) ("A general release, or a broad covenant not to sue, is not ordinarily contrary to public policy simply because it involves antitrust claims. Thus, in the absence of proof that it was the product of duress, such a release is fully enforceable."); *Smith v. Sprint Commc'ns Co. L.P.*, 2003 WL 103010, at *1 (N.D. Ill. Jan. 10, 2003) ("Intervenors claim that class settlements can never provide relief outside the pleadings. We reject this notion because a class settlement can provide for the broad release of claims, including claims not stated in the complaint."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167347, at *2 (N.D. Ill. Apr. 4, 1996) ("[T]he essential element of the Settlement Agreement is the release of all claims, asserted and unasserted, which arise out of the pricing practices that have been the subject of this class action. . . . Such releases have been found to be "reasonable and customary, and without them

6

A0006

settlement of large antitrust actions would not be desirable."). And as already mentioned above, the fact that the DAPs themselves brought bid-rigging claims together in the same complaints with supply reduction claims, undermines any argument that the Class claims are not broad enough to permit the release of bid-rigging claims.

###    D.    Value of Bid-Rigging Claims

The DAPs argue that the settlement is unfair because their bid-rigging claims "were not considered in connection with the negotiation of the Settlement—either substantively or quantitatively—and were released for nothing." R. 7040 at 15. But the DAPs do not dispute that the settlement with Simmons of more than $8 million is a substantial recovery. They make no argument about what recovery amount would sufficiently account for the bid-rigging claims. The Court cannot find that the settlement does not provide a substantial recovery without some analysis as to how the recovery amount fails to fairly compensate the Class for releasing their claims, including the bid-rigging claims.

Rather than argue what an appropriate recovery amount would have been, the DAPs latch on to the Class's statement that the bid-rigging claims were not considered in settlement negotiations. *See* R. 7052 at 23 ("the Track 1 . . . settlement did not focus on individual bid rigging recovery"). On this basis, they argue that the value of the bid-rigging claims is not accounted for in the settlement amount. But the Class's concession that the bid-rigging claims were not a "focus" of settlement negotiations does not mean the value of those claims was not considered, and

certainly not that they were released for "nothing." All parties in this case were well aware of the bid-rigging claims and their potential merits and value. Although Class Counsel had dropped those claims by proceeding on Track 1, no judgment had been entered on those claims. The Class could always have attempted to reassert them. Their potential reemergence was necessarily a part of the value of the settlement, simply by the fact that the release is broad enough to cover them.

The DAPs' argument about "value" ignores how Class Counsel's decision to proceed on Track 1, and drop bid-rigging claims, was key in creating an environment that encouraged Defendants to settle. The Class's settlement with Simmons, and many of the other defendants, was largely possible because the Class proceeded on Track 1 to summary judgment and trial. The Class did not reach a settlement with Simmons until summary judgment had been fully briefed for more than two months (*see* motion for settlement filed June 1, 2023, R. 6596) and the trial date was only three months away. It cannot be denied that the pressure of pending summary judgment and trial played a significant role in the parties' ability to reach a settlement. Absent Class Counsel's decision to push the case forward along Track 1, and not pursue the bid-rigging claims, it is unlikely settlement would have occurred here.

Furthermore, the defense verdict at trial demonstrates that this is not an easy case for the Class. The Class's settlements with all defendants but the one that went to trial demonstrates that Class counsel recognizes the difficulties in this case. The

settlement amount certainly accounts for this difficulty. The trial loss is a post hoc justification for the Class's decision to settle with Simmons for the amount it did.

No class members have objected to the settlement other than the DAPs. This is strong evidence that the settlement amount is a substantial recovery. The Court cannot ignore the fact that the only objectors here are those who failed to opt out on time. The DAPs concern here is not the value of the settlement. It is that they are bound by the settlement at all. But the DAPs had an easy and well-established mechanism for avoiding this predicament in the Rule 23 opt out procedures. They missed the deadline. That is not a reason to find the settlement does not provide substantial value to the Class.

### F.    Conflict of Interest

Next and last, the DAPs repackage their argument about the value of the settlement as an argument that Class Counsel violated its fiduciary duty by favoring settlement of the supply reduction claims over the bid-rigging claims. The problem with this argument is that the DAPs will recover equally with all other class members. If the DAPs believe—as they assert in their brief—that their bid rigging claims are more valuable than the other class members' supply reduction claims, the DAPs should demonstrate how that is so. They make no attempt to do so in their brief, and simply state it as though it is a readily apparent fact. Even if this case were not as complex as it is, bald assertions of fact without reference to the record would not carry the day. If the value of the various claims were as straightforward as the DAPs make it out to be, they would support their argument with evidence or more

9

sophisticated argument. Instead, all the DAPs have to offer is conjecture, and that is not a sufficient reason to reject a settlement that has finally resolved this part of years of intense and expensive litigation.

## Conclusion

Therefore, the DAPs' motion for clarification [6930] is denied in that the Court finds that the DAPs' bid-rigging claims were released by the Class settlements with Defendants Koch, Simmons, House of Raeford, Mountaire, and OK Foods. Additionally, the Court denies the DAPs' objection [7040] to the settlement with Simmons.

ENTERED:

_Thomas M Durkin_

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: December 11, 2023

A0010

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION, | Case No.: 1:16-cv-08637 |
| | The Honorable Thomas M. Durkin |
| This Document Relates To: | |
| THE DIRECT PURCHASER PLAINTIFF ACTION | |

**ORDER GRANTING DIRECT PURCHASER PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF THE SETTLEMENT WITH
THE SIMMONS DEFENDANTS**

1002435.3

A0011

On December 12, 2023, at 10:00 a.m. CST, this Court held a hearing on Direct Purchaser Plaintiffs' Motion for Final Approval of the Settlement with Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. ("Simmons") ("Motion"). Direct Purchaser Plaintiffs ("Plaintiffs") have entered into the Settlement Agreement with Simmons. The Court, having reviewed the Motion, its accompanying memorandum and the exhibits thereto, the Settlement Agreement, and all papers filed, hereby finds that the Motion should be **GRANTED** as to the settlement with Simmons.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Court has jurisdiction over the subject matter of this litigation, including the actions within this litigation, and over the parties to the Settlement Agreement, including all members of the Certified Class (also referred to herein as the "Class") and Simmons.

2. For purposes of this Order, except as otherwise set forth herein, the Court adopts and incorporates the definitions contained in the Settlement Agreement.

3. The Court previously appointed the law firms of Lockridge Grindal Nauen P.L.L.P., and Pearson Warshaw, LLP (then known as Pearson, Simon & Warshaw, LLP) as Co-Lead Class Counsel for the Certified Class.

4. The Settlement was entered into on behalf of the Class certified by this Court in its order dated May 27, 2022, ECF No. 5644 (the "Certified Class"):

> All persons who purchased raw Broilers directly from any of the Defendants or their respective subsidiaries or affiliates either fresh or frozen, in the form of: whole birds (with or without giblets), whole cut-up birds, or parts (boneless or bone in) derived from the front half of the whole bird, for use or delivery in the United States from December 1, 2008 until July 31, 2019.

5. In its order of June 12, 2023, ECF No. 6615, the Court preliminarily determined the proposed Settlement to be fair, reasonable, adequate, and in the best interests of the Certified Class. (*See* ECF No. 6615 at 2.) The Court further held that the proposed Settlement Agreement,

2

A0012

which was arrived at by arm's length negotiations by highly experienced counsel, was within the range of possible approval and raised a reasonable basis for presuming that the Settlement and its terms satisfy the requirements of Federal Rules of Civil Procedure 23(c)(2) and 23(e), and thus the Court directed that notice of the Settlement be given to the Certified Class. (*Id.*) The Court determined that the proposed notice plan complied with Rule 23(c)(2)(B) and due process as it constituted the best notice practicable under the circumstances, including individual notice via mail and email to all Certified Class members who could be identified through reasonable effort. The direct mail and email notice was supported by reasonable publication notice to reach Certified Class members who could not be individually identified. (*Id.* at 3.) That notice also informed Class members of their right to object to the Settlement, should they so choose, instructed them on how to file an objection, and informed them that any such objection was due no later than November 11, 2023.

6.      Following the Court's preliminary approval of the Settlement, the Court-appointed claims administrator implemented the notice plan described above.

7.      Furthermore, Simmons has served upon the appropriate state officials and the appropriate federal official notice under the Class Action Fairness Act, 28 U.S.C. § 1715 ("CAFA").

8.      The Court hereby finally approves the Settlement Agreement and its terms and finds that the Settlement is, in all respects, fair, reasonable and adequate to the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and directs consummation of the Settlement Agreement according to its terms and conditions.

A0013

9.     This Court hereby dismisses on the merits and with prejudice all Claims in the DPP action against Simmons, with each party to bear its own costs and fees, including attorneys' fees, except as provided in the Settlement Agreement or as approved by the Court.

10.     The Releases in the Settlement Agreement are incorporated herein and the Releasing Parties shall, by operation of law, be deemed to have released all Released Parties from the Released Claims.  All entities who are Releasing Parties (as defined in the Settlement Agreement) or who purport to assert claims on behalf of the Releasing Parties are hereby and forever barred and enjoined from commencing, prosecuting, or continuing, against the Released Parties, in this or any other jurisdiction, any and all claims, causes of action or lawsuits, which they had, have, or in the future may have, arising out of or related to any of the Released Claims as defined in the Settlement Agreement.

11.     The Released Parties are hereby and forever released and discharged with respect to any and all claims or causes of action which the Releasing Parties had, have, or in the future may have, arising out of or related to any of the Released Claims as defined in the Settlement Agreement.

12.     The notice given to the Class, including individual notice to all members of the Class who could be identified through reasonable efforts, was the most effective and practicable under the circumstances. This notice provided due and sufficient notice of the proceedings and of the matters set forth therein, including the proposed settlement, to all persons entitled to such notice, and this notice fully satisfied the requirements of Rules 23(c)(2) and 23(e)(1) of the Federal Rules of Civil Procedure and the requirements of due process.

13.     One objection to the Settlement was filed by a group of direct action plaintiffs that failed to opt out of the Direct Purchaser Class. (*See* ECF No. 6872.) The objectors are: Boston

Market Corporation, Bojangles' Restaurants, Inc. and Bojangles' Opco, LLC, Golden Corral Corp., El Pollo Loco, Inc., Zaxby's Franchising LLC, Domino's Pizza LLC and Domino's Pizza Distribution LLC, Cracker Barrel Old Country Store, Inc., CBOCS Distribution, Inc., Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill, Shamrock Foods Company, United Food Service, Inc., FIC Restaurants, Inc. d/b/a Friendly's, The Johnny Rockets Group, Inc., WZ Franchise Corp., Captain D's LLC, and White Castle Purchasing Co. (*See* ECF No. 7040 at n.1, collectively referred to as the "Certain Restaurant DAPs".) Having fully reviewed and considered the underlying Motion and the objection, pursuant to the Court's December 11, 2023 Order, the Certain Restaurant DAPs' objection is overruled. (*See* ECF No. 7083.)

14.     Any member of the Class who failed to timely and validly request to be excluded from the Certified Class shall be subject to and bound by the provisions of the Settlement Agreement, the Released Claims contained therein, and this Order with respect to all Released Claims, regardless of whether such members of the Class seek or obtain any distribution from the Settlement Fund. Such persons/entities are not entitled to any recovery from the Settlement Fund.

15.     As set forth in the notice to the Class, at this time Co-Lead Class Counsel are not seeking attorneys' fees or class representative incentive awards (but are seeking *pro rata* reimbursement of litigation expenses, *see* ECF No. 6963), or to distribute Settlement proceeds to qualified claimants; when Co-Lead Class Counsel determine to do so, they will notify the Class and seek the Court's approval.

16.     Without affecting the finality of this Final Judgment in any way, this Court hereby retains continuing exclusive jurisdiction over: (a) consummation, administration and implementation of the Settlement Agreement and any allocation or distribution to Class members pursuant to further orders of this Court; (b) disposition of the Settlement Fund; (c) hearing and

A0015

determining applications by Plaintiffs for attorneys' fees, costs, expenses, and interest; (d) the actions in this litigation until the Final Judgment has become effective and each and every act agreed to be performed by the parties all have been performed pursuant to the Settlement Agreement; (e) hearing and ruling on any matters relating to any plan of allocation or distribution of proceeds from the Settlement; (f) the parties to the Settlement Agreement for the purpose of enforcing and administering the Settlement Agreement and the releases contemplated by, or executed in connection with the Settlement Agreement; (g) the enforcement of this Final Judgment; and (h) over any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement, that cannot be resolved by negotiation and agreement.

17. The Court finds, pursuant to Rules 54(a) and (b) of the Federal Rules of Civil Procedure, that judgment should be entered and further finds that there is no just reason for delay in the entry of final judgment as to the parties to the Settlement Agreement. Accordingly, the Clerk is hereby directed to enter this Final Judgment forthwith.

**IT IS SO ORDERED.**

DATED: December 12, 2023

_____

HON. THOMAS M. DURKIN

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3    IN RE BROILER CHICKEN ANTITRUST        )
     LITIGATION                             )
4                                           )    Docket No. 16 C 8637
     ------------------------------         )
5                                           )    Chicago, Illinois
     THIS DOCUMENT RELATES TO:              )    December 12, 2023
6                                           )    10:00 a.m.
     THE DIRECT PURCHASER PLAINTIFF         )
7    ACTION                                 )

8    TRANSCRIPT OF PROCEEDINGS - Final Approval of the Settlements
                  with Simmons, Mountaire, and OK Foods
9                 BEFORE THE HONORABLE THOMAS M. DURKIN

10
     APPEARANCES:
11
     For the Direct          MR. BOBBY POUYA
12   Purchaser Plaintiffs:   MR. MICHAEL H. PEARSON
                             Pearson Warshaw, LLP
13                           15165 Ventura Boulevard, Suite 400
                             Sherman Oaks, California 91403
14
     For the Simmons         MS. LYNN H. MURRAY
15   Defendants:             MR. MAVERIC R. SEARLE
                             Shook Hardy & Bacon LLP
16                           111 South Wacker Drive, Suite 4700
                             Chicago, Illinois  60606
17
     For Defendant           MS. MAGGIE HICKEY
18   Mountaire Farms:        ArentFox Schiff LLP
                             233 South Wacker Drive, Suite 7100
19                           Chicago, Illinois  60606

20   For the OK Foods        MS. MEGAN C. CHURCH
     Defendants:             MoloLamken LLP
21                           300 North LaSalle Street
                             Chicago, Illinois 60654
22
     Court Reporter:         ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
23                           Official Court Reporter
                             United States District Court
24                           219 South Dearborn Street, Room 1432
                             Chicago, Illinois 60604
25                           312.408.7782
                             Elia_Carrion@ilnd.uscourts.gov

1     (Proceedings heard in open court.)

2          THE COURT:  All right.  Let's call the case.

3          THE CLERK:  All right.  This is Case No. 16 CV 8637,

4     In re Broiler Chicken Antitrust Litigation.

5          May I please ask that attorneys present on behalf of

6     any plaintiffs state their names.

7          MR. POUYA:  Good morning, Your Honor.  Bobby Pouya,

8     Pearson Warshaw, for the direct purchaser class plaintiffs.

9          MR. PEARSON:  Good morning, Your Honor.

10    Michael Pearson on behalf of the direct purchaser class as

11    well.

12         THE CLERK:  And on behalf of defendants, please.

13         MS. MURRAY:  Good morning, Your Honor.  Lynn Murray

14    and Maveric Searle on behalf of Simmons.

15         MS. HICKEY:  Good morning, Your Honor.  Maggie Hickey

16    on behalf of Mountaire.

17         MS. CHURCH:  And good morning, Your Honor.

18    Megan Church on behalf of OK Foods.

19         THE COURT:  Okay.  All right.  Good morning,

20    everyone.

21         We are here on the direct purchaser plaintiffs'

22    motion for final improvement of the settlements with Simmons,

23    Mountaire, and OK Foods.  Is that correct?

24         MR. POUYA:  Yes, Your Honor.  There's also a motion

25    for reimbursement of costs that's concurrently pending.

1          THE COURT:  All right.  And is there any opposition

2    to that motion either -- I'll note that this hearing is also

3    being held telephonically.

4          Is there anyone who is here to oppose the motion for

5    reimbursement of litigation expenses?

6          All right.  The record should reflect no one has

7    voiced an opposition to it.

8          I've read it over.  It's appropriate.  And so the

9    motion for reimbursement of litigation expenses is granted.

10          Was there a proposed order -- I believe there was --

11    that was submitted?

12          MR. PEARSON:  Yes, Your Honor.  An amended proposed

13    order was emailed to the Court on December 1st.

14          THE COURT:  Okay.  We'll enter that order today.

15          All right.  First step, then, is there anyone here

16    who is opposing the motion for final improvement of the

17    settlements with Simmons, Mountaire, and OK Foods, recognizing

18    that certain restaurant DAPs had filed an opposition to it in

19    writing and we ruled on that opposition yesterday?

20          So is there anyone, either on the line or in court,

21    who is opposing final approval of the settlements with

22    Simmons, Mountaire, and OK Foods?

23          All right.  The record should reflect no one has

24    voiced opposition.  For the record, the -- certainly, certain

25    restaurant direct action plaintiffs have voiced an opposition.

1   It's been noted in numerous briefs and in filings related

2   to -- both the motion to clarify that was filed and also the

3   objection in this case, and we dealt with that in

4   Document 7083 in an order entered yesterday.

5           All right.  I've reviewed the motion and the

6   memorandum in support of it.  These are, in my mind, fair and

7   adequate settlements.  It relates to Simmons paying a little

8   over $8 million; Mountaire paying close to $16 million; and

9   OK Foods paying close to $5 million, collectively about -- not

10  about, but exactly $28,775,150.

11          These amounts were preliminarily approved, along with

12  settlements with Koch and House of Raeford.  I found

13  preliminarily these settlements all fell within the range of

14  reasonableness and ordered notice to be provided to class

15  members.  The reaction that were sent -- notice was given

16  pursuant to a notice plan that's been approved by the Court

17  and used in other settlements.  No class member objected to

18  either Mountaire or OK Foods settlements.  And as noted, there

19  was a single objection to the Simmons settlement, which I've

20  already overruled.

21          The defendants -- or the direct purchasers are not

22  seeking attorneys' fees at this time.  And I assume that'll be

23  something you seek later when the Koch and House of Raeford

24  settlements are in for final approval.

25          MR. POUYA:  That's correct, Your Honor.

1        THE COURT:  Okay.  All right.  The total settlements

2   to date in this case by the direct purchaser class is -- are

3   over $284 million, which is an extraordinary amount recovered

4   in this case.  The settlements of Simmons, Mountaire, and OK

5   were all reached through confidential, protracted, and arm's

6   length negotiations; result of extensive, good faith, and

7   hard-fought negotiations between knowledgeable and skilled

8   counsel were entered into after extensive factual

9   investigation and legal analysis.  And in the opinion of

10  experienced co-lead class counsel are fair, reasonable, and

11  adequate.  I believe that the settlement agreements are in the

12  best interest of the certified class members and will be

13  approved by the Court.

14        The notice plan that was adopted and found -- and

15  approved by the Court early in this case, early in the course

16  of these settlements was satisfied in this particular set of

17  settlements administered by the court-appointed settlement

18  administrator A.B. Data Ltd.

19        I believe the settlements are fair, reasonable, and

20  adequate and -- in this case.  In evaluating fairness of a

21  proposed class action settlement, courts typically consider

22  the following factors:

23        The strength of the plaintiffs' case compared to the

24  amount of defendants' settlement offer; the assessment of the

25  likely complexity, length, and expense of the litigation; the

1    evaluation -- and evaluation of the amount of opposition to

2    the settlement among affected parties; the reaction of class

3    members; the opinion of competent counsel; and the stage of

4    the proceedings and amount of discovery completed at the time

5    of sentencing -- at the time of settlement.  Apologize.

6              A number of these factors were addressed at the

7    preliminary approval hearing.  But class members themselves

8    had now received notice, and they've had a chance to weigh in.

9    Upon notice, other than the single objection to the Simmons

10   settlement, there's been no objection to this settlement, nor

11   would I expect there to be, because these are good

12   settlements.  They're significant amounts of money for claims

13   where the amount of risk is significant.

14             You only need to look at the verdict involving

15   Sanderson to know that had these defendants fought the case

16   and had the plaintiff not settled with them and had they gone

17   to trial, they certainly -- defendants could have been found

18   liable and the damages could have been significant, much

19   higher than the settlement amounts.

20             But just as a plaintiff can prevail at trial, a

21   defendant can prevail at trial.  And Sanderson is evidence of

22   that.  Had any of these defendants prevailed at trial, none of

23   the money that is the subject of the settlement agreement

24   would have been awarded.  The plaintiffs would've walked away

25   empty-handed.  And so for that reason, the settlements

1    eliminated a significant amount of risk to members of the

2    class.

3        The arm's length negotiations and experienced counsel

4    requirement was met here.  There's no collusion that I could

5    see at all.  And certainly, class counsel is very experienced.

6    That's why they were appointed as class counsel.

7        The stage of the proceedings, the amount of discovery

8    supports final approval.  These cases settled shortly before

9    trial.  Plaintiffs' counsel knew exactly what the evidence

10   they had that was available that they could've used for trial.

11   They evaluated the strength of the case in light of that

12   evidence and -- just as defense counsel did -- and made a

13   decision that the settlement was in the best interest of the

14   class.  This was not a settlement reached very early in the

15   case before there could be a fair evaluation of the evidence.

16       In addition to the evidence, certainly there were

17   written discovery; there were numerous depositions taken.

18   There were -- they had the benefit of knowing the Court's

19   evaluation of the evidence in a lengthy summary judgment

20   opinion that was entered.  And, again, as I noted, no class

21   members objected to the Mountaire and OK Foods settlements,

22   and only one group of direct action plaintiffs objected to the

23   Simmons settlement.

24       So for all those reasons, I'm going to grant final

25   approval to these three settlements.

1          You have submitted an order -- a proposed order in

2    that regard.  Is that correct?

3          MR. POUYA:  Yes, Your Honor.  I do want to address

4    that.  Since -- although, they are presented as one motion,

5    they're three separate settlements.

6          THE COURT:  Yeah.

7          MR. POUYA:  We submitted three separate proposed

8    orders.  And in light of the fact that there's an objection to

9    the Simmons settlement, we request that we -- that the Court

10   enter the three orders separately.

11         THE COURT:  I'll do that.  And do you note the

12   objection, and probably haven't yet, but note the fact that we

13   overruled it in Document 7083?

14         MR. POUYA:  We can do that for the Simmons settlement

15   for -- and -- and submit an amended proposed order for that

16   one that references the -- the Court's ruling on the

17   objection.

18         THE COURT:  That's fine.  Are the other two proposed

19   orders in final form?

20         MR. POUYA:  They are.

21         THE COURT:  Okay.  We'll enter those two, and we'll

22   enter the Simmons one when it's amended.

23         MR. POUYA:  Thank you, Your Honor.

24         THE COURT:  Anything else from plaintiffs?

25         MR. POUYA:  No, Your Honor.

1    THE COURT:  Anything else from each of the

2  defendants?

3    MS. MURRAY:  No, Your Honor, not for Simmons.

4    MS. HICKEY:  No, Your Honor, for Mountaire.

5    MS. CHURCH:  No, Your Honor, for OK Foods.

6    THE COURT:  Well, that concludes the proceedings.

7    Anyone on the phone who needs to comment on anything

8  we just did today?

9    All right.  The record should reflect no one has

10  spoken up.

11    Thank you all.

12    (Proceedings concluded at 10:10 a.m.)

13                        CERTIFICATE

14    I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.

16  */s/ Elia E. Carrión*          *5th day of January, 2024*

17  _____    _____
    *Elia E. Carrión*                    *Date*
    *Official Court Reporter*

18

19

20

21

22

23

24

25